**S. J. GROVES & SONS COMPANY,
Appellant,**

v.

**WARNER COMPANY.**

No. 77–1802.

United States Court of Appeals,
Third Circuit.

Argued Feb. 23, 1978.

Decided April 17, 1978.

Edward W. Madeira, Jr., Stephen S. Phillips, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for appellant.

Edward F. Mannino, Thomas A. Leonard, III, Lawrence D. Berger, Karen Marek McAlinn, Philadelphia, Pa., for appellee; Dilworth, Paxson, Kalish, Levy & Kauffman, Philadelphia, Pa., of counsel.

Before ALDISERT, VAN DUSEN and WEIS, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

A contract for the concrete work on a bridge being constructed over the Schuylkill River in Southwest Philadelphia resulted in heavy losses for appellant S.J. Groves & Sons Company. Alleging that much of its loss was caused by the performance of its subcontractor who supplied ready-mixed concrete, Groves filed suit against Warner in the district court. At trial, however, efforts to recoup a substantial portion of the loss from the subcontractor met with only partial success. Concluding that disallowance of many of Groves' claims was based upon factual determinations supported by the record, we affirm the judgment of the district court except insofar as it too narrowly interpreted the duty to mitigate damages.

As part of a highway improvement program, the Pennsylvania Department of Transportation undertook the erection of the Girard Point Bridge in Southwest Philadelphia and selected American Bridge Company as the prime contractor. Plaintiff-appellant Groves was awarded a subcontract for the placement of the bridge's concrete decks and parapets and contracted with the defendant Warner for the delivery of ready-mixed concrete for use at the Girard Point site. Groves filed this lawsuit claiming extensive losses because of Warner's failure to deliver adequate supplies at scheduled times. The case was tried to the court and after preparing detailed findings of fact and conclusions of law, the trial judge entered judgment in favor of the plaintiff in the amount of $35,401.28.[1] Dissatisfied with the denial of a large part of its claimed damages, Groves appealed.

The contract at issue provided that Warner would supply approximately 35,000 cubic yards of ready-mixed concrete at a rate of 40 cubic yards per hour and at times specified by Groves. Having its plant close to the job site, Warner was equipped to prepare and deliver large quantities of concrete.[2] The agreement was executed in

---

1. The total amount of the damages awarded was $55,659.73. From this, the court deducted $20,258.45 for material on which Groves had withheld payment as a setoff for its alleged damages.

2. In preparing to carry out its commitment toward the construction of the bridge, Groves considered, but rejected, the possibility of building its own cement batching plant at the job site and, instead, chose to contract with Warner.

March, 1970, and the first concrete was delivered to the job site in July of that year. Groves' progress was hindered by three lengthy strikes in the spring and summer of 1970, 1971, and 1972 which postponed completion of its contract from July of 1972 to October of 1972. The work was also delayed by rejections of concrete that failed to meet state specifications, although the number of rejections was within expectations on such a project. Although concrete pours were completed at a later date than anticipated, the number of weeks during which the pours were made remained substantially the same as was originally planned.

Groves expected to pour concrete for the decks of the bridge in the mornings and then to use some of the crew to construct parapets in the afternoons. This general plan was frustrated by Warner's frequent failures to make deliveries in compliance with Groves' instructions. As a result, deck pours originally scheduled for the mornings often extended into the afternoons and evenings and created overtime labor expense.

Concerned with its lagging progress, Groves considered securing other sources of concrete as early as 1971 but found no real alternatives. It was too expensive to build its own batching plant at the site and the only other source of ready-mixed concrete in the area was the Trap Rock Company, located near the Warner plant. Trap Rock, however, was not certified to do state work in 1971 and its price was higher than Warner's. Moreover, the production facilities at Trap Rock were limited, as was the number of trucks it had available. Meanwhile, Warner continued to assure Groves that deliveries would improve.

Despite its promises, Warner's performance continued to be erratic and on June 21, 1972, the Pennsylvania Department of Transportation ordered all construction at Girard Point halted until the quality of Warner's service could be discussed at a conference. A meeting took place the next day with state officials and representatives from Warner, Groves, and other contractors in attendance. Based on Warner's renewed assurances of improved performance, state officials allowed work to resume on June 26, 1972. From that date until July 20, 1972, Warner's delivery service improved significantly, although it still did not consistently meet Groves' instructions. In the months following and until completion in October of 1972, Warner's performance continued to be uneven and unpredictable.

On June 14, 1972, when Groves again approached Trap Rock, that firm maintained that it could service the job at the desired delivery rate but did not reduce its price. On July 11, 1972, Trap Rock was certified by the state and the next day agreed to accept the same price as Warner. Groves, nevertheless, decided to continue with Warner as its sole supplier.

The district judge found that Warner had acted in bad faith by deliberately overcommitting its ability to manufacture and deliver enough concrete, providing an inadequate number of trucks to service Groves' project, and following a policy of providing delivery at only 75 percent of the ordered rate. On that basis, the court stripped Warner of the protection offered by the no-claim-for-delay clause in its contract and awarded damages. In the court's view, on June 15, 1972 Groves had no reasonable expectation that Warner's performance would improve to "totally satisfactory levels" and by July 11, 1972, "there were no practical impediments to employing Trap Rock as a supplemental supplier." The court therefore concluded that "as of July 12, 1972, Groves had an obligation to utilize Trap Rock as a supplemental supplier . . . in order to mitigate any possible 'delay damages' resulting from Warner's service." Accordingly, the court did not award Groves all the delay damages it sought, allowing only $12,534 for overtime which had been paid on days when Warner's deliveries were late before, but not after, July 12, 1972. Claims for loss of productivity not resulting in overtime were denied be-

cause, despite its problems, Groves did complete the work it had scheduled on each day.

Since the first pour on July 9, 1970 resulted in an unacceptable deck panel due to Warner's defective concrete and inadequate workmanship by Groves, the court allocated the cost of removing and replacing the panel. The total expenditure was $42,357.11 and Groves was awarded $10,589.43. In another mismanaged pour on June 20, 1972, Warner's deliveries were late and Groves was required to spend an additional $5,861.55. That sum was awarded to Groves and is not now disputed. Neither is the sum of $26,674.75 attributed to Warner's miscalculation of the volume of concrete actually delivered. The court also disallowed Groves' claims for extra parapet crews, construction of extra forms, and loss of overhead and profits, having concluded the plaintiff had not met its burden of proof.

Although Groves sustained heavy losses in its work on the bridge, the district court recognized that not all were properly attributable to Warner. The lengthy strikes—occurring each year at the very beginning of the pouring season—adverse weather, and an overly optimistic expectation of the efficiency which could be obtained on a project of this nature were also substantial factors leading to Groves' misfortune. Thus, rejection of many of Groves' claims was based primarily on factual findings which we may not disturb unless they are clearly erroneous. *Krasnov v. Dinan,* 465 F.2d 1298 (3d Cir. 1972). The trial judge was exceptionally painstaking in his preparation of the extensive findings of fact and our review does not reveal any of them to be clearly erroneous. We find it necessary to refer to only two matters—both of a legal, rather than purely factual nature.

The plaintiff contends it is entitled to all, not part, of the loss it sustained as a result of the defective slab poured on July 9, 1970. The trial judge found that there was an inadequate amount of retarder in the concrete which caused premature solidification,

although the state did not reject the concrete for that reason. In addition, some of the concrete which Warner supplied was too dry and there was failure to observe instructions as to delivery times. The first truck was late in reaching the job site and the following two arrived too soon. Groves' crews, on the other hand, having a case of "first day jitters," functioned inefficiently, and weather conditions were extremely unfavorable. The court determined that Warner's poor performance was "a substantial cause" of the defective slab to the extent of one-fourth of the damages sought by Groves.

Groves contends that Warner did not meet its contractual obligations on July 9 and should be liable for the entire loss. But the court's analysis of the incident demonstrates that the conduct of both parties contributed in some degree to the loss. The burden is on the plaintiff to establish proximate cause between breach and damage and if the loss caused by a breach cannot be isolated from that attributable to other factors, no damages may be awarded. *Lichter v. Mellon-Stuart Co.,* 305 F.2d 216 (3d Cir. 1962). Here, the trial judge might well have decided that there was an inadequate basis for proration between damages precipitated by Warner's conduct and that of Groves, in which event there would have been no recovery. The judge, however, believed that there was enough evidence to determine that 25 percent was a proper allocation.

Plaintiff's argument that it is entitled to all of its loss overlooks the fact that Groves accepted at least part of the responsibility for the mishap at the time it occurred. Furthermore, the trial court made specific findings of Groves' ineptness in the handling of its equipment and labor force on the day in question. Any error in the allocation could only be based on a lack of proof establishing the extent of harm caused exclusively by Warner. From that standpoint, Groves is the beneficiary of the district court's ruling and has no ground for complaint. The action of the trial judge in

dividing the loss between the parties was a fair solution to a difficult problem and is not reversible in the circumstances here.[3]

■ The other matter of law which warrants attention is that of mitigation of damages. The district court determined that since the contract was essentially one for the sale of a product with an additional requirement of proper and timely delivery, the Uniform Commercial Code should govern. *See Bevard v. Howat Concrete Co.,* 140 U.S.App.D.C. 96, 433 F.2d 1202 (1970). We agree that in this diversity case the Pennsylvania courts would treat the contract as one for the sale of goods and so we look to the Code.

The court described the transaction between Groves and Warner as an installment contract as that term is defined in Pa.Stat. Ann. tit. 12A, § 2–612(1) (Purdon 1970),[4] that is, an agreement to deliver goods in "separate lots to be separately accepted." Where there is non-conformity with respect to one or more installments which substantially impairs the value of the whole contract, there is a breach of the whole. § 2–612(3). In the district court's view, such a breach occurred as of July 12, 1972 and should have been apparent to Groves. At that time Warner had been recertified by the Pennsylvania Department of Transportation and Trap Rock had also received state approval. The district court reasoned that in order to recover consequential damages for defective performance after that date, Groves had to prove that it had complied with the obligation to "cover" or otherwise mitigate damages incurred after Warner's breach in July, 1972.

■ Section 2–715 provides that the consequential damages a buyer may recover are those which "could not reasonably be prevented by cover or otherwise." Thus, generally, when a seller refuses to deliver goods, the buyer must attempt to secure similar articles elsewhere as a prerequisite to receiving consequential damages. "Cover" is defined in § 2–712(1):

> "After a breach . . . the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller."

Since Trap Rock was available in July, 1972 as a source of ready-mixed concrete, the district court held that Groves was under "a duty to attempt to prevent the consequential damages . . . by obtaining the supplemental supplier" and that Groves' failure to do so barred it, as a matter of law, from receiving such compensation. In this ruling the trial court erred.

■ The requirement of cover or mitigation of damages is not an absolute, unyielding one, but is subject to the circumstances. Comment 2 to § 2–712 says:

> "[t]he test of proper cover is whether at the time and place the buyer acted in good faith and in a reasonable manner, and it is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective."

Essentially the cover rules are an expression of the general duty to mitigate damages and usually the same principles apply.[5]

**3.** Whether it is proper to allocate damages in situations where specific amounts cannot be attributable to separate causes is not free from doubt. In *Lichter v. Mellon-Stuart, supra,* the trial court was able to distinguish between items of damage which were compensable and those which were not. *Cf. Krauss v. Greenbarg,* 137 F.2d 569 (3d Cir.) *cert. denied,* 320 U.S. 791, 64 S.Ct. 207, 88 L.Ed. 477 (1943). *See* the discussion in Dobbs, Handbook on Law of Remedies, § 12.3 at 798–803 (1973).

**4.** All of the Pennsylvania statute references to the Uniform Commercial Code are found in Title 12A of Purdon's Statutes. In the interest

of simplicity, all references to the Code hereafter will be only to section number.

**5.** It has been said that there is not a "duty" on the part of a plaintiff to mitigate damages but rather the principle is that he is entitled to only those damages which he could not avoid by reasonable effort. The "duty" to mitigate cannot be enforced and it is only when recovery is sought that the defense may be invoked. *See* Restatement of Contracts § 336, comment d; 5 A. Corbin, Contracts § 1039 (1964). D. Dobbs, Handbook on the Law of Remedies, § 3.7 at 188 (1973). The test for plaintiff's efforts is reasonableness, McCormick on Damages § 35 (1935).

*See R.I. Lampus & Co. v. Neville Cement Products Corp.,* 232 Pa.Super.Ct. 242, 336 A.2d 397, 405 (1975), *aff'd on other grounds,* 474 Pa. 199, 378 A.2d 288 (1977). The burden of proving that losses could have been avoided by reasonable effort and expense must be borne by the party who has broken the contract. *Carl Beasley Ford, Inc. v. Burroughs Corp.,* 361 F.Supp. 325, 335 (E.D. Pa.1973), *aff'd,* 493 F.2d 1400 (3d Cir. 1974); 5 A. Corbin, Contracts § 1039 (1964).

Here, the court found that as of July 12, 1972, Groves had no reasonable expectation that Warner's performance would improve to totally satisfactory levels, that there were no practical impediments to employing Trap Rock as a supplemental supplier, and therefore Groves had a duty to contract with Trap Rock to mitigate delay damages. We do not think that the premises justify the conclusion.

In July, 1972, Groves found itself confronted with a breach by Warner and the consequent necessity to choose among a number of alternative courses of action. In the circumstances, Groves could have:

1. Declared the contract breached, stopped work, and held Warner liable for all damages. This was not a realistic alternative.

2. Set up its own cement batching plant at the job site. Time and expense made this impractical.

3. Accepted Warner's assurances that it would perform satisfactorily in the future, *see* § 2–609(1).[6] The court, however, found that it would have been unreasonable to have any faith in continued assurances from Warner.

4. Substituted Trap Rock for Warner for the remainder of the contract. The court made no finding on the reasonableness of this choice but it appears questionable whether Trap Rock had the resources to meet all of Groves' require-ments.

5. Engaged Trap Rock as a supplemental supplier; or

6. Continued dealing with Warner in the belief that though its performance would not be satisfactory, consequential damages might be less than if the other alternatives were adopted.

Of the six alternatives, Groves was seemingly faced with three practical ones—all subject to drawbacks. Groves had to: allow Warner to continue in the hope of averting even greater losses; substitute Trap Rock for all of Warner's work—a choice made doubtful by Trap Rock's ability to handle the project; or, lastly, use Trap Rock as a supplemental supplier.

The last choice—the option chosen by the district court—was subject to several difficulties which the court did not discuss. Even if Trap Rock supplied part of the contract with perfect scheduling, there would be no guarantee that Warner would do so. The element of erratic deliveries by Warner would not necessarily be cured, nor would the problems with the quality of concrete it delivered to the site. The presence of two independent suppliers acting separately might indeed pose problems more severe than those which existed before. Moreover, the record reveals that Trap Rock received some of its raw material from Warner and Groves suspected that Warner might not have been too cooperative if part of the Girard Bridge contract were taken away by Trap Rock.

Confronted with these alternatives, Groves chose to stay with Warner, a decision with which the district court did not agree. The court's preference may very well have been the best; that, however, is not the test. As Judge Hastie wrote in *In re Kellett Aircraft Corp.,* 186 F.2d 197, 198–99 (3d Cir. 1950):

"Where a choice has been required between two reasonable courses, the person whose wrong forced the choice can not complain that one rather than the other was chosen. [McCormick on Damages,

---

**6.** Section 2–609(1) reads in part: "When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assur-ance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return."

§ 35 (1935).] The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter. . . . One is not obligated to exalt the interest of the defaulter to his own probable detriment."

There are situations in which continuing with the performance of an unsatisfactory contractor will avoid losses which might be experienced by engaging others to complete the project. 5 Corbin, *supra*, § 1039 at 249. *See also* Hillman, *Keeping the Deal Together After Material Breach—Common Law Mitigation Rules, The UCC, and the Restatement (Second) of Contracts*, 47 U.Colo. L.Rev. 553 (1976).[7] In such a setting, mitigation is best served by continuing existing arrangements. As the troubled Prince of Denmark once observed we

" . . . rather bear those ills we have, Than fly to others that we know not of . . . ."[8]

There is another unusual feature in this case. Engaging Trap Rock as an additional source of supply was a course of action open to Warner as well as Groves. Indeed, on other commercial work Warner *had* used Trap Rock as a supplemental supplier. When the Pennsylvania Department of Transportation approved Trap Rock, Warner could have augmented its deliveries to Groves by securing extra trucks and concrete from Trap Rock as needed. Such an arrangement by Warner would have had the distinct advantage of having one subcontractor directly answerable to Groves for proper delivery, timing and quality. ▮ Where both the plaintiff and the defendant have had equal opportunity to reduce the damages by the same act and it is equally reasonable to expect the defend-

ant to minimize damages, the defendant is in no position to contend that the plaintiff failed to mitigate. Nor will the award be reduced on account of damages the defendant could have avoided as easily as the plaintiff. *See* Dobbs, Handbook on the Law of Remedies § 3.7 at 186 (1973). The duty to mitigate damages is not applicable where the party whose duty it is primarily to perform a contract has equal opportunity for performance and equal knowledge of the consequences of nonperformance. *See Parker v. Harris Pine Mills*, 206 Or. 187, 291 P.2d 709 (1955).

Here, where the alternative the court imposed upon Groves was available to Warner as well, Warner may not assert Groves' lack of mitigation in failing to do precisely that which Warner chose not to do. Particularly is this so in light of the finding that Warner breached the contract in bad faith.

Thus, either upon the ground that Groves should not be faulted for choosing one of several reasonable alternatives or upon the basis that Warner was bound to procure an additional supplier, we hold that the district court erred in imposing on Groves as a matter of law a duty to engage Trap Rock. Accordingly, we vacate that portion of the court's judgment which allowed damages for delay only until July 12, 1972. We remand for assessment of damages from that point to completion of the contract on the same basis as that used for the pre-July 12 delay damages. In all other respects, the judgment of the district court will be affirmed.

---

7. The circumstances here stand in marked contrast to those in *R.I. Lampus Co. v. Neville Cement Prod. Corp., supra,* where a buyer was found not justified in deliberately using defective material in manufacturing products for its customers. There, adequate materials could have been secured from the seller.

8. W. Shakespeare, Hamlet, Act III, scene I, lines 81–82.