

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-24-2002

# Glenn Distr Corp v. Carlisle Plastics

Precedential or Non-Precedential: Precedential

Docket No. 00-2710

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Glenn Distr Corp v. Carlisle Plastics" (2002). *2002 Decisions*. Paper 430.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/430

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed July 24, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-2710
No. 00-2790

GLENN DISTRIBUTORS CORPORATION,
        Appellant in No. 00-2710

v.

CARLISLE PLASTICS, INCORPORATED
        Appellant in No. 00-2790

Appeal from the United States District Court
for the Eastern District of Pennsylvania
Civ. No. 98-cv-02317
District Judge: Honorable James T. Giles

Argued December 18, 2001

Before: SLOVITER and McKEE, Circuit Judges, and
DEBEVOISE, District Judge*

(Opinion Filed: July 24, 2002)

        James T. Smith, Esq. (Argued)
        Rebecca D. Ward, Esq.
        Blank, Rome, Comisky & McCauley
        One Logan Square
        Philadelphia, Pennsylvania 19103

         Attorneys for Appellant
_____

* Honorable Dickinson R. Debevoise, United States Senior District Judge
for the District of New Jersey, sitting by designation.

        David B. Snyder (Argued)
        Mindee J. Reuben
        Fox, Rothschild, O'Brien & Frankel
        2000 Market Street
        10th Floor
        Philadelphia, Pennsylvania 19103

         Attorneys for Appellee

OPINION OF THE COURT

McKEE, Circuit Judge:

This appeal arises out of a lawsuit Glenn Distributors
Corp. filed against Carlisle Plastics, Inc. for breach of a

contract in which Glenn had agreed to purchase certain merchandise from Carlisle. At trial, the jury agreed that Carlisle had breached the contract and it awarded Glenn actual damages as well as lost profits. However, the district court thereafter granted Carlisle's motion for judgment as a matter of law as to the award of lost profits. The court held that, although Glenn proved the amount of its lost profits, Glenn's failure to establish that it made reasonable efforts to "cover" precluded recovery of those consequential damages.

Glenn appeals the court's order vacating the award of lost profits, and Carlisle has filed a cross-appeal in which it argues that the district court erred in failing to hold as a matter of law that it did not breach the contract with Glenn.1 For the reasons that follow, we will affirm the district court's ruling as to Carlisle's liability, but reverse the order vacating the jury award for lost profits.

I.

Glenn is a purchaser and reseller of various types of

_____

1. As we note more fully below, on September 7, 1999 the district court initially granted summary judgment in favor of Carlisle. However, the court thereafter granted Glenn's motion for reconsideration and vacated that order. The matter then proceeded to trial before a jury.

close-out merchandise. Carlisle manufactures plastic goods, particularly trash bags, and sells them to wholesale and retail customers, including close-out purchasers such as Glenn. Glenn and Carlisle have had a business relationship since at least 1995. On June 5, 1997, Carlisle faxed Glenn a list of close-out merchandise that Carlisle had available for sale. That list specified several types and quantities of trash bags.

The phrase, "[a]ll quantities subject to change," or "[q]uantities subject to change[ ]" appeared at the bottom of each of the five pages comprising the June 5 list. J.A. at 41-46. Glenn Segal, the president of Glenn Distributors, responded to the fax on June 12, 1997 by sending Purchase Order No. 10354 ("the Purchase Order") to Sandy Johnson at Carlisle. The Purchase Order was for all of the close-out goods on the June 5 list. The Purchase Order specifically referenced that list stating: "QUANTITIES ARE PER FAXED LIST FROM CARLISLE ON JUNE 5, 1997[.]" Id. at 47 (capitals in original). The Purchase Order contained columns labeled: "Quantity," "Prod. #," "Description," "Pack," "Price," and "Amount." Several quantities were listed in the "quantity" column, and descriptions and prices were entered under the corresponding columns in rows reflecting the quantities that were listed for given items and prices. Id. The Purchase Order also contained a handwritten entry asking Johnson to "PLEASE SIGN AND FAX BACK AND CALL FOR DELIVERY APPTS." Id. (capitals in original).

On June 13, 1997, Johnson responded to the Purchase Order by sending Segal a letter thanking him for the order he had placed for "all of our close-outs." The letter also informed Segal that Johnson "had to enter the orders with a per case price so that if the quantities change we have a way to bill you for only what you have received." The June 13 letter also offered an additional 2,184 cases of merchandise for sale. Sometime thereafter, Segal faxed the letter back to Johnson accepting the additional cases Johnson had offered. Glenn offered to pay Carlisle a total amount of approximately $990,000.

Between June and September 1997, Glenn sent Carlisle a total of $750,000 in eight separate payments, beginning with a $100,000 payment on June 12, 1997. Carlisle began

3

shipping goods shortly after June 12, and continued shipping through August 1997. During that period, Carlisle shipped approximately $736,000 worth of trash bags to Glenn. However, some of the goods that Glenn ordered from the June 5 list were never delivered because Carlisle sold them to other customers.

On May 1, 1998, Glenn sued Carlisle alleging, inter alia, that Carlisle's failure to deliver all of the trash bags listed in the June 5 fax constituted a breach of contract. Glenn claimed damages in the amount of $14,000 for payments it had made to Carlisle for goods that Carlisle never shipped, and lost profits in the amount of approximately $230,000. The latter sum represented the profit Glenn claimed it would have realized from the resale of the trash bags that Carlisle never shipped. Glenn and Carlisle eventually filed cross motions for summary judgment. Carlisle claimed that the undisputed facts established as a matter of law that it was not under any binding obligation to sell any given quantity of goods. Glenn claimed the reverse. Glenn claimed it was entitled to summary judgment as to Carlisle's liability as a matter of law inasmuch as there was no dispute that Carlisle did not ship all of the items ordered by Glenn that were listed in the original fax.

The district court, however, initially agreed with Carlisle and granted Carlisle summary judgment based upon the court's conclusion that the "subject to change" language in the June 5 fax clearly and unambiguously established that the quantities of goods Carlisle would sell could change at any time and for any reason. Accordingly, the court entered an order awarding Glenn only the $14,000 it had paid for merchandise it never received, and dismissing the remainder of Glenn's claim. However, on January 13, 2000, the court subsequently granted Glenn's motion for reconsideration and vacated the entry of summary judgment. All issues of liability and damages were then submitted to a jury at the ensuing trial.

During that trial, Glenn Segal offered the following

testimony about efforts he made to replace the merchandise that was ordered from the June 5 fax but never shipped:

Q: Did you take any steps to cover -- to cover the shortfall that had occurred as a result of this particular non-shipment?

A: I tried to, yes.

Q: Okay. Can you explain to the Court and to the members of the jury in substance the steps that you took?

A: Well, they shipped us two categories of trash bags, one was Ruffies, which is a brand name, and the other was supermarket names, which are like a -- like a half-brand name, because people know it's a certain quality when it's going to be -- when it has a supermarket name on it. So, we went to trade shows, we asked salesmen, we were looking for another trash bag company where we could buy a name brand or we could buy supermarket labels at the closeout price, and we couldn't do it. We tried to -- we tried to replace the goods, but really the only ones that could replace Ruffies was Carlisle, they're the only ones that make the product.

Q: Did you have any luck on the bags that weren't Ruffies?

A: No.

Q: Okay. Did you take steps to try to buy those too?

A: We -- we looked in the marketplace, went to trade shows, we spoke to salesmen, we -- we couldn't replace them at that time.

J.A. at 303-04.

On cross-examination, Carlisle's counsel questioned Segal about his earlier deposition testimony. At his deposition, Segal had testified that he did not know who else made supermarket brand trash bags and he did not know how to discover who did. He stated, "[t]he only ones I knew had them were Carlisle and I tried to get them to do it[.]" Id. at 308. He added that he would have to "go to the supermarket and buy up trash bags retail" to replace the ones Carlisle didn't ship. Id. Segal had also testified in his deposition that despite twenty years in the business and

numerous area contacts, he could not think of any way to replace the private label bags other than buying from Carlisle or purchasing bags at retail prices. See id. at 309-

As noted earlier, the jury returned a verdict in favor of Glenn, and awarded a total of $244,003.00 in damages, including $230,003.00 for the lost profit Glenn claimed resulted from not being able to resell the merchandise it expected to receive from Carlisle. Following trial, the district court denied Carlisle's Rule 50 motion for judgment as a matter of law as to liability, but granted it as to the award of lost profits. The court reasoned that Glenn failed to establish that it could not reasonably have avoided losing those profits by attempting to "cover" and entered judgment in favor of Glenn for $14,000 plus interest. This appeal and cross-appeal followed.2

II.

As noted earlier, Carlisle is cross-appealing the district court's order of January 13, 2000 by which the court vacated the order of September 7, 1999 granting partial summary judgment in favor of Carlisle. Inasmuch as our discussion of Glenn's appeal of the court's grant of Carlisle's motion for judgment as a matter of law overlaps the issues raised in Carlisle's cross-appeal, we need not address the court's summary judgment ruling separately.

Our review of the district court's grant of Carlisle's Rule 50 motion is plenary. See Rhone Poulenc Rorer Pharmaceuticals, Inc. v. Newman Glass Works, 112 F.3d 695, 696 (3d Cir. 1997). In reviewing the grant of a judgment as a matter of law under Fed. R. Civ. P. 50 following a jury verdict, we must view the evidence in the light most favorable to the non-moving party, and determine whether the record contains the "minimum quantum of evidence from which a jury might reasonably afford relief." Mosley v. Wilson, 102 F.3d 85, 89 (3d Cir.

_____

2. The district court had subject matter jurisdiction over plaintiff 's claims pursuant to 28 U.S.C. S 1331. We have jurisdiction over the appeal and the cross-appeal under 28 U.S.C. S 1291.

6

1996), quoting Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d 685, 691 (3d Cir. 1993).

The standard for granting summary judgment under Rule 56 "mirrors the standard for a directed verdict under Fed. R. Civ. P. 50(a)[.]" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); see also Beers-Capitol v. Whetzel, 256 F.3d 120, 130 n.6 (3d Cir. 2001). A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

Accordingly, we must determine if the evidence here was sufficient to establish a binding contractual obligation on the part of Carlisle to sell a given quantity of merchandise to Glenn. If it was, we must then consider if Glenn presented sufficient evidence to prove consequential damages in the form of lost profits that resulted from Carlisle's breach. In resolving this latter inquiry, we must consider Glenn's argument that the district court improperly placed the burden of proving reasonable efforts to cover on Glenn rather than requiring Carlisle to establish Glenn's failure to cover as an affirmative defense.

A.

The district court concluded that the substantive law of Pennsylvania controlled this dispute, and that is not challenged on appeal.3 It is well-settled under Pennsylvania

_____

3. Inasmuch as the district court was exercising diversity jurisdiction, it was required to apply the substantive law of Pennsylvania, the forum state. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); McKenna v. Pacific Rail Serv., 32 F.3d 820, 825 (3d Cir. 1994). Our analysis is therefore controlled by applicable decisions of the Pennsylvania Supreme Court. If that Court has not decided an issue before us, we look to decisions of the intermediate appellate courts of Pennsylvania for guidance. See McKenna, 32 F.3d at 825; Nationwide Ins. Co. v. Resseguie, 980 F.2d 226, 229 (3d Cir. 1992). Of course, our analysis is also controlled by applicable state statutes as interpreted by Pennsylvania's appellate courts.

contract law that the meaning of a clear and unambiguous written contract and the intent of the contracting parties must be determined from the four corners of the contract. See Steuart v. McChesney, 444 A.2d 659, 661 (Pa. 1982). However, if the written contract is ambiguous, a court may look to extrinsic evidence to resolve the ambiguity and determine the intent of the parties. See Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 93 (3d Cir. 2001). We have explained that a contract is ambiguous under Pennsylvania law

> if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning. A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction.

Duquesne Light Co. v. Westinghouse Elec. Corp. , 66 F.3d 604, 614 (3d Cir. 1995) (quoting Samuel Rappaport Family Partnership v. Meridian Bank, 657 A.2d 17, 21-22 (Pa.

Super. Ct. 1995)).

Here, the June 5 fax from Carlisle to Glenn clearly and unambiguously set forth specified quantities for each description of merchandise offered for sale to Glenn. However, as noted, the fax also stated: "quantities subject to change" and "quantities per faxed list." J.A. at 41-46. The district court concluded that Carlisle's specification of precise quantities while at the same time informing the buyer that the quantities were "subject to change" created an ambiguity as to the intent of the parties regarding the quantity Carlisle intended to sell, and the quantity Glenn intended to buy from the faxed list. We agree.

The Purchase Order specifically stated that Glenn wanted to buy the "quantities . . . per faxed list . . . on June 5, 1997." Id. at 47. Moreover, as noted above, the Purchase Order stated the specific quantities of each item Glenn was

8

agreeing to buy, and those quantities were taken directly from Carlisle's June 5 fax. Given this scenario, Carlisle may have intended the notification that "quantities[were] subject to change" to inform Glenn that Carlisle was not promising any specific quantity and that the quantities on the list were only illustrative of the quantities Carlisle might have available for sale. However, Glenn did not interpret the fax in this manner as Glenn took some care to specify the quantities it wanted to purchase, and the specific price for each of the types of merchandise it wanted. Moreover, Glenn thereafter began paying Carlisle based upon the quantities specified in the Purchase Order.

Carlisle may also have intended the reservation of quantities listed in the June 5 fax to inform Glenn that, although Carlisle may have been offering the specific quantities set forth therein, Carlisle's obligation to sell them was contingent upon availability. This would have allowed Carlisle room to adjust for problems in manufacturing the items listed, and offered flexibility in the event of inventory error. Given that the language was susceptible to at least these two opposing reasonable alternatives (and perhaps others), the district court allowed extrinsic evidence of the intent of the contracting parties.4

Glenn called Sandra Johnson as an adverse witness at trial in an effort to establish the meaning of the reservation as to quantity. The explanation that she offered was that the reservation on the June 5 fax was intended to allow for any discrepancies in inventory. However, she also admitted that the merchandise that had been offered to Glenn on June 5 had been sold to other customers. She also testified that the " 'quantities subject to change' on there allowed [Carlisle] to be able to ship all, none or some of a particular item." J.A. at 433. When questioned more closely, "All, none or some?" she confirmed, "Yes." Id. Glenn's counsel then impeached Johnson with her deposition testimony. During

4. Courts must be mindful to "adopt an interpretation [of ambiguous language] which under all circumstances ascribes the most reasonable, probable, and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished." Metzger v. Clifford Realty Corp., 476 A.2d 1, 4 (Pa. Super. Ct. 1984).

her deposition, Glenn's counsel had asked Johnson if the reservation was intended to guard against "some inaccurate number in the computer inventory report[,]" to which Johnson responded, "Yes." Id. at 439-40. She specifically denied that the qualification as to quantities was intended to allow Carlisle to ignore an offer from a buyer in the event that a better deal came along.

The jury obviously rejected Johnson's testimony that the disputed language was intended to allow for discrepancies in inventory or that it allowed Carlisle to sell some or all of the items listed. The jury's finding that Carlisle breached its agreement with Glenn is clearly supported by the evidence, and the district court correctly concluded that Carlisle was not entitled to judgment as a matter of law against Glenn on Glenn's breach of contract claim. Accordingly, we will affirm the orders denying Carlisle's Rule 50(b) motion as to liability as well as the January 13, 2000 order granting Glenn reconsideration and vacating the partial summary judgment order in favor of Carlisle. However, we do not agree that the district court was correct in granting Carlisle's Rule 50(b) motion for judgment as a matter of law as to lost profits.

B.

Pennsylvania has adopted the Uniform Commercial Code ("UCC"). Under the UCC, a buyer can recover consequential damages resulting from a seller's breach of contract. See 13 PA. CONST. STAT. ANN. S 2714(c) (2002);Nat'l Controls Corp. v. Nat'l Semiconductor Corp., 833 F.2d 491, 495 (3d Cir. 1987). However, a buyer may recover lost profits only to the extent that the loss was not reasonably avoidable. See 13 PA. CONST. STAT. ANN. S 2715(b)(1) (2002). Accordingly, Pennsylvania imposes a duty of mitigation or "cover." That duty is defined as making "in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller." See 13 PA. CONST. STAT. ANN.S 2712(a) (2002).

Here, the district court concluded that Glenn had the burden of proving its reasonable efforts to cover. The court stated, "Glenn . . . must present sufficient evidence of its

reasonable efforts to 'cover,' that is, to purchase and resell replacement goods in an effort to offset its anticipatory losses." Glenn Distrib. Corp. v. Carlisle Plastics, Inc., No.

CIV.A. 98-2317, 2000 WL 1224941, at *10 (E.D. Pa. Aug. 29, 2000). The court stretched that duty to include not only trash bags, but anything else that "reasonably" could have been sold to a customer to recover some or all of Glenn's lost profit. The court concluded:

> Glenn's cover duty required it not only to look for replacement trash bags to sell to the same customers, as had bought previous Carlisle products, but to look for any replacement close-out items from any of its suppliers that Glenn could re-sell to any customers to recover some or all of its profit. For example, Glenn could have recouped some of its lost profits by purchasing and reselling Hershey product to some customer, although perhaps not to the same customers which would have purchased the trash bags. However, there is no evidence that Glenn took any steps to look for, purchase, or sell items other than trash bags.

Id. The court therefore required Glenn to demonstrate reasonable efforts to obtain items for resale to customers "from a myriad of manufacturers, including Hershey, Nestle, Carnation, and Johnson & Johnson[.]" Id. We conclude that was error.

We hold that Carlisle, not Glenn, had the burden of proof as to Glenn's efforts to cover. Moreover, we do not believe that the Supreme Court of Pennsylvania would require a reseller to attempt to obtain any and all items that might conceivably be resold in order to mitigate lost profits resulting from a reseller's inability to acquire a particular close-out item.

1.

> It is a familiar rule of law that a party who suffers a loss due to a breach of contract has a duty to make reasonable efforts to mitigate his losses. Put another way, the amount recoverable by the damaged party must be reduced by the amount of losses which could have been avoided by that party's reasonable efforts to

11

> avoid them. Furthermore, the party who has breached the contract or caused the loss has the burden of showing the losses could have been avoided through the reasonable efforts of the damaged party.

State Public School Bldg. Auth. v. W. M. Anderson, Co., 410 A.2d 1329, 1331 (Pa. Commw. Ct. 1980) (emphasis added; citations omitted). Thus, in applying Pennsylvania law, we stated in S.J. Groves & Sons Co., 576 F.2d 524 (3d Cir. 1978) that "the cover rules are an expression of the general duty to mitigate damages and usually the same principles apply. The burden of proving that losses could have been avoided by reasonable effort and expense must be borne by the party who has broken the contract." S.J. Groves & Sons Co., 576 F.2d at 528-29 (emphasis added; citations

omitted). Therefore, Pennsylvania requires that the plaintiff attempt reasonable efforts to cover in order to mitigate damages, and the failure to do so is an affirmative defense to be proven by the defendant/seller. See Koppers Co., Inc. v. Aetna Cas. and Surety Co., 98 F.3d 1440, 1448 (3d Cir. 1996); see also Williams v. Masters, Mates & Pilots of Am., 120 A.2d 896, 901 (Pa. 1956); Aircraft Guar. Corp. v. Strato-Lift, Inc., 991 F.Supp. 735, 738 (E.D. Pa. 1998); Carl Beasley Ford, Inc. v. Burroughs Corp., 361 F. Supp. 325, 335 (E.D. Pa. 1973), aff 'd, 493 F.2d 1400 (3d Cir. 1974).

The district court rested its burden of proof analysis upon Big Knob Volunteer Fire Co. v. Lowe & Moyer Garage, Inc., 487 A.2d 953 (Pa. Super. Ct. 1985). There, the court did place the burden of proving the inability to cover on the plaintiff/buyer. See Big Knob Volunteer Fire Co. , 487 A.2d at 959-960. However, Big Knob involved a claim for replevin of a specific, customized item under UCC S 2-716. It is therefore distinguishable. The Official Comment to 13 PA. CONS. STAT. ANN. S 2712, which mirrors UCC S 2-712(duty to "cover"), makes clear that the rules and burdens relating to the duty to "cover" are based upon the extent to which goods are fungible:

> [T]he operation of the [UCC] section on specific performance of contracts for "unique" goods must be considered [when applying to duty to "cover"] for availability of the goods to the particular buyer for his particular needs is the test for that remedy and

12

> inability to cover is made an express condition to the right of the buyer to replevy the goods.

Official Comment, 13 PA. CONS. STAT. ANN. S 2712, P 3.

Specific performance is only appropriate where the uniqueness of goods precludes a remedy in damages. The law therefore requires the plaintiff/buyer to show the goods under a breached contract were unique. This does not apply here as the items involved, trash bags, are largely fungible. Moreover, we are bound by our prior resolution of the appropriate burden of proof as set forth in S.J. Groves & Sons Co., supra. Accordingly, it is clear that if the breaching seller believes that the plaintiff 's efforts to cover were not adequate, that defendant must present sufficient evidence to allow a reasonable fact finder to deny recovery to the buyer on that basis.

Here, the district court concluded that Glenn's evidence was "not detailed or specific enough to establish that Glenn took reasonable efforts [to cover] under the circumstances[,]" because Glenn did not provide evidence that similar merchandise could not have reasonably been acquired. Glenn, 2000 WL 1224941, at *10. However, it was up to Carlisle to establish that reasonably similar items were available and that it would have been reasonable for Glenn to acquire them. Inasmuch as Carlisle did not

introduce sufficient evidence to prevail on what should have been an affirmative defense, the record supports the jury's award of lost profits.

2.

Moreover, the Official Comment to 13 PA. CONS. STAT. ANN. S 2712 is instructive as to the types of goods that may be purchased as substitute merchandise in an effort to mitigate loss. Paragraph 2 of the Comment provides that a buyer may purchase "goods not identical with those involved but commercially usable as reasonable substitutes under the circumstances of the particular case[.]" Official Comment, 13 PA. CONS. STAT. ANN. S 2712,P 2 (emphasis added). The duty is therefore more narrow than that imposed by the district court. It does not include all

13

merchandise that might be resold no matter how dissimilar it might be to the original product.

The district court did not cite any cases to support its conclusion that Glenn's duty of mitigating the lost sales of trash bags required it to go into the market in search of products from such diverse sources as Hershey, Nestle, Carnation, or Johnson & Johnson, and our research has not disclosed any Pennsylvania appellate cases that suggest that is the law. Moreover, even assuming arguendo that it was commercially reasonable for Glenn to look for other classes of merchandise from sources such as those, it was up to Carlisle, not Glenn, to introduce the relevant evidence and establish the commercial feasibility of doing so. Thus, we hold that the district court erred in vacating the jury award for lost damages based upon Glenn's purported failure to cover.

C.

In its cross-appeal, Carlisle also argues that irrespective of Glenn's duty to cover, "Glenn's evidence [as to the $230,003.00 in lost profits] was nothing more than unsubstantiated speculation and the district court's decision may be affirmed on that basis as well." Carlisle's Br. at 25. We again disagree.

The district court thoroughly and adequately disposed of this argument in its Memorandum Opinion dated August 29, 2000. See Glenn, 2000 WL 1224941, at * 8. There, the district court correctly noted that evidence of lost profits "need not be mathematically precise, but the evidence must establish the fact with a fair degree of probability." Id. (internal quotations omitted), quoting Advent Sys. Ltd. v. Unisys Corp., 925 F.2d 670, 680 (3d Cir. 1991). 5 Moreover,

_____

5. Under Pennsylvania law, a buyer is entitled to recover lost profits as consequential damages of a seller's breach of contract when the seller knows (or has reason to know) the buyer is purchasing goods for resale.

National Controls Corp. v. National Semiconductor Corp., 833 F.2d 491, (3d Cir. 1987). Carlisle does not claim that it did not know that Glenn was purchasing for resale. Moreover, this record would not support that argument as it is clear from the circumstances, including the quantities involved and the relationship between the buyer and seller, that Carlisle knew, or should have known, that Glenn was not going to use the trash bags itself.

14

the district court meticulously set forth the evidence Glenn presented in support of its claim for lost profits, and the methodology Glenn Segal used in calculating the figure that the jury awarded. We agree with the district court's analysis of this issue and reject Carlisle's challenge to the award of lost profits substantially for the reasons set forth by the district court.6

III.

For the foregoing reasons, the district court's order of

_____

6. The district court concluded that the following evidence sufficiently established the amount of Glenn's lost profits:

> The only evidence from Glenn as to the amount of its lost profits is the Damages Report prepared by [Glenn] Segal and his testimony. Carlisle challenges the reliability of the Damages Report, that is, Carlisle argues that the Report is unreliable and fails to establish the amount of lost profits with reasonable certainty or a fair degree of probability. The reliability of evidence goes to its weight rather than to its admissibility . . . .

> Segal [testified] that approximately 60 cases of 20 different items used in calculating net lost profits were not Carlisle products and were not sold to Glenn under this contract. Segal did recalculate the lost profits without those 60 items, however, and Glenn urges that any difference in the final figures is infinitesimal. The jury apparently agreed and there is no basis to disturb that finding.

> [Sandra] Johnson testified, based on her knowledge of the products that Carlisle sells, that other items used by Segal in creating the Damages Report were not on the June 5 list or June 13 letter and were not shipped as part of P.O. No. 10354 . . . . Johnson also reviewed several pages of the Report at random and testified that there were a number of items contained therein that were not sold to Glenn as part of P.O. No. 10354. However, Johnson conceded that every item included in the Damages Report had, at one time or another, been produced by Carlisle. Segal also testified that every item included in the Damages Report was received from Carlisle since June 1997, the relevant time period for this transaction, and that Glenn did not purchase private-label trash bags from any producer other than Carlisle. Johnson also testified that she did not know whether substitutions had been made at the warehouse at the time of shipping, although she did state that the shipping department had no authority to do so.

15

January 13, 2000 granting Glenn's motion for
reconsideration and vacating the entry of summary
judgment in favor of Carlisle is affirmed. We will vacate the
district court's order dated August 29, 2000 granting
Carlisle's motion for judgment as a matter of law as to
damages for lost profits, and remand to the district court
for entry of judgment in favor of Glenn in the full amount
of the jury award.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

_____

        The jury heard all of this evidence and was entitled to consider all
        of it, particularly the credibility of witnesses. The jury apparently
        believed Segal's testimony that the only items that Glenn sold and
        included in the Damages Report had been shipped by Carlisle
        during the relevant time period and that any private-label bags had
        been received from Carlisle. The [sic] apparently concluded,
        therefore, that the Damages Report was sufficiently reliable as to be
        accorded controlling evidentiary weight and that it accurately
        reflected the amount of Glenn's lost profits. There was sufficient
        evidence to support that finding and no basis to disturb it.

Glenn, 2000 WL 1224941, at *8 (internal citations omitted).

16