

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-27-2006

# Stepnowski v. Commissioner IRS

Precedential or Non-Precedential: Precedential

Docket No. 05-3665

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Stepnowski v. Commissioner IRS" (2006). *2006 Decisions*. Paper 643.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/643

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-3665

CHARLES P. STEPNOWSKI,

Appellant

v.

COMMISSIONER OF INTERNAL REVENUE;
HERCULES INCORPORATED

Appeal from the Decision of the
United States Tax Court
Docket No. 03-08383
Tax Court Judge: Honorable Mary Ann Cohen

Argued June 8, 2006

Before: AMBRO, FUENTES
and NYGAARD, Circuit Judges

(Opinion filed:  July 27, 2006)

Mervin M. Wilf, Esquire (Argued)
Mervin M. Wilf, Ltd.
One South Broad Street, Suite 1630
Philadelphia, PA   19107

      Counsel for Appellant

Eileen J. O'Connor
   Assistant Attorney General
Kenneth L. Greene, Esquire
Steven W. Parks, Esquire (Argued)
United States Department of Justice
Tax Division
P.O. Box 502
Washington, DC  20044

David S. Fryman, Esquire (Argued)
Brian M. Pinheiro, Esquire
Ballard Spahr Andrews & Ingersoll
1735 Market Street, 51st Floor
Philadelphia, PA  19103

      Counsel for Appellees

---

## OPINION  OF  THE  COURT

AMBRO, <u>Circuit Judge</u>

Congress changed the applicable interest rate for the present-value calculation of pension plans' lump-sum payments to retirees. Hercules Inc. later amended its pension plan to match the changed interest rate, but that amendment resulted in a lower lump-sum payment to Charles Stepnowski, who retired several months after the amendment. To determine whether Hercules' amendment was valid, we decide whether the Commissioner of the Internal Revenue Service extended the deadline for this amendment. We hold that the Commissioner did so, and that Hercules' amendment was timely and valid. We therefore affirm.

## I. Factual Background and Procedural History

Stepnowski worked at Hercules from 1973 to December 2002. He participated in Hercules' retirement plan, which allows participants to take a lump-sum payment upon retirement. This payment is the present-value equivalent of 51% of the retiree's expected lifetime monthly pension benefits. Pension Plan of Hercules Inc., sched. B., art. VII, § D.1. The present-value amount is calculated using the federally prescribed mortality table and a specified interest rate. *Id.* § D.4.

Hercules has a defined-benefit plan under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* It was established in 1913 and uses the calendar year as its plan year. Hercules made amendments to the plan in October

2001.[1]

The amendments to Hercules' plan changed the interest rate used to calculate lump-sum payments. For payments made on or after January 1, 2002, the present-value amount is calculated using the interest rate on 30-year Treasury securities. Pension Plan, sched. B., art. VII, § D.4.a(2). The Treasury rate took the place of the interest rate published by the Pension Benefit Guaranty Corporation (PBGC).[2]

Interest rates bear an inverse relationship to present-value amounts; a higher interest rate results in a lower present-value

---

[1] This statement of the facts is contested by the parties. Hercules claims that the plan was amended in October 2001. Stepnowski, on the other hand, argues that it was amended as of January 28, 2002. Hercules' Finance Committee passed a resolution amending the plan in October 2001, and Hercules' Board of Directors appears to have confirmed the resolution in January 2002. The Tax Court stated that Hercules "executed" the amendments in January 2002. *Stepnowski v. Comm'r*, 124 T.C. 198, 200 (2005). In any event, the difference in dates is immaterial to our conclusion in this case.

[2] Under the amendment, the plan calculated the present-value amount for payments made between January 1, 2000, and January 1, 2002, using both the Treasury rate and the PBGC rate, and the retiree got the higher of the two amounts that result. Pension Plan, sched. B, art. VII, § D.4.b. Stepnowski, however, retired after January 2002.

payment, and vice versa.[3]   The Treasury rate has historically been higher than the PBGC rate, so—because he retired after January 2002 (*i.e.*, after the amendment)—Stepnowski's lump-sum payment was lower than it would have been had Hercules kept the PBGC rate.[4]

In February 2002, Hercules requested a determination from the Commissioner that its pension plan met all of the statutory qualification requirements.   In March 2002, Stepnowski sent the Commissioner a letter contending that the amendment precluded the Hercules plan from so qualifying.  In March 2003, the Commissioner issued Hercules a favorable determination letter on the plan.   Stepnowski then filed a petition in the United States Tax Court for a declaratory judgment that the Hercules plan was not qualified.

The Tax Court held in favor of Hercules and the Commissioner, *Stepnowski v. Comm'r*, 124 T.C. 198, 220

---

[3] This is so because the typical present-value formula involves division by the interest rate.   Thus, as the interest rate gets higher, the numerator is divided by a larger number, resulting in a lower present value.

[4] The parties estimate that Stepnowksi got $25,000 less because of the plan amendment.

(2005), and Stepnowski appeals.[5]

## II. Discussion

### A. Statutory and regulatory background

Section 401(a) of the Internal Revenue Code describes the qualification requirements for pension plans. (Only qualified plans are tax exempt under I.R.C. § 501(a).) One of the requirements in § 401(a) is that, "except as provided in section 417," the plan must pay out a vested participant's accrued benefit "in the form of a qualified joint and survivor annuity." I.R.C. § 401(a)(11)(A). Section 417 allows plan participants to waive these annuity payments in favor of a "cash-out"—that is, a lump-sum payment of the participants' annuity benefits. *See id.* § 417(a).

Plan participants can therefore choose to take a lump-sum cash-out payment of the present value of their annuity, and § 417(e) governs the determination of that present-value amount. Specifically, § 417(e)(3)(A)(i) provides that the present value of a participant's benefits "shall not be less than the

---

[5] The Tax Court had jurisdiction under I.R.C. § 7476(a). We have appellate jurisdiction under I.R.C. § 7482(a).

"We review the Tax Court's legal determinations *de novo*, but we do not disturb its factual findings unless they are clearly erroneous." *Lattera v. Comm'r*, 437 F.3d 399, 401 (3d Cir. 2006).

present value calculated by using the applicable mortality table and the applicable interest rate."

The "applicable interest rate" is a statutorily defined term. Before 1994, it meant the PBGC interest rate. Tax Reform Act of 1986, Pub. L. No. 99-514, § 1139(b), 100 Stat. 2085, 2487. In 1994, Congress changed the definition in § 417(e)(3)(A)(ii)(II); it now means "the annual rate of interest on 30-year Treasury securities." (The change was made as part of the Retirement Protection Act of 1994, which was itself part of the Uruguay Round Agreements Act. Pub. L. No. 103-465, tit. VII, subtit. F, § 767(a)(2), 108 Stat. 4809, 5038.)

Elsewhere in the Code lurks § 411, which controls vesting standards; a plan cannot be qualified unless it satisfies this section. I.R.C. §§ 401(a)(7), 411(a). Specifically, § 411(d)(6)—known as the "anti-cutback provision"—blocks plan amendments that decrease participants' accrued benefits. *See id.* § 411(d)(6)(A); *see also id.* § 411(d)(6)(B) ("[A] plan amendment which has the effect of . . . eliminating or reducing an early retirement benefit . . . with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits.").

As noted, because the Treasury interest rate is generally higher than the PBGC rate, the normal result is a lower lump-sum payout (as happened here). Once the Retirement Protection Act changed the statutory rate, plan amendments following that

7

change could have been in danger of triggering the anti-cutback provision. Congress accordingly provided that "[a] participant's accrued benefit shall not be considered to be reduced in violation of section 411(d)(6) . . . merely because . . . the benefit is determined in accordance with section 417(e)(3)(A) . . . , as amended by this Act." Retirement Protection Act § 767(d), 108 Stat. at 5040. The Department of the Treasury followed suit, providing that plan amendments replacing the PBGC rate with the Treasury rate were not cutbacks. Treas. Reg. § 1.417(e)-1(d)(10)(iv).[6]

**B. Does Treasury Regulation § 1.417(e)-1(d)(10)(i) contain an amendment deadline?**

Stepnowski's unhappiness with the Treasury rate, as compared to the PBGC rate, is ultimately due to an act of Congress. He cannot complain that Hercules amended its plan to match the statutory interest rate, so he is forced to argue about when Hercules amended the plan. Stepnowski concedes that Hercules could have amended the plan without penalty on or before December 31, 1999, but he claims that the Treasury

---

[6] This Regulation contains two conditions: First, the plan amendment has to replace the PBGC rate. Treas. Reg. § 1.417(e)-1(d)(10)(iv)(A). Second, the replacement rate has to be no higher than the Treasury rate, as calculated at certain times. *Id.* § 1.417(e)-1(d)(10)(iv)(B). We agree with the Tax Court that Hercules' plan amendment satisfied both of these conditions. *See Stepnowski*, 124 T.C. at 210–11.

8

Regulations imposed that date as a deadline on such interest-rate amendments and that it was not extended.

The Regulation at issue is Treas. Reg. § 1.417(e)-1(d)(10)(i), which provides that a prospective plan amendment that "changes the interest rate or the mortality assumptions used for the [present-value calculation] merely to eliminate use of the [PBGC] interest rate . . . , or the applicable mortality table, with respect to a distribution form described in paragraph (d)(6) of this section," is not a cutback if it is adopted by December 31, 1999.

Stepnowski therefore argues that paragraph (d)(10)(i) requires interest-rate amendments like Hercules' to be in place on or before December 31, 1999. The Commissioner argues—and the Tax Court held—that the December 1999 deadline did not apply to the Hercules amendment. Both parties' arguments turn on whether the phrase "with respect to a distribution form described in paragraph (d)(6) of this section" modifies "mortality table" alone or both "interest rate" and "mortality table." The distribution form described in paragraph (d)(6) is a nondecreasing annual benefit—in other words, *not* a lump-sum payment like in Hercules' plan. Thus, if the phrase modifies both "mortality table" and "interest rate," this provision does not apply to amendments like Hercules'.

The debate is between the last-antecedent rule of construction and its grammatical corollary. The last-antecedent

rule generally holds "that qualifying words, phrases, and clauses are to be applied to the words or phrase immediately preceding and not to others more remote." *United States v. Hodge*, 321 F.3d 429, 436 (3d Cir. 2003) (internal quotation marks omitted). The corollary rule of grammar generally states that, where there is a comma before a modifying phrase, that phrase modifies all of the items in a series and not just the immediately preceding item. *See, e.g.*, *Elliot Coal Mining Co. v. Dir.*, 17 F.3d 616, 630 (3d Cir. 1994) ("Th[e] use of a comma to set off a modifying phrase from other clauses indicates that the qualifying language is to be applied to all of the previous phrases and not merely the immediately preceding phrase."); *Nat'l Sur. Corp. v. Midland Bank*, 551 F.2d 21, 34 (3d Cir. 1977); *see also Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.*, 186 F.3d 210, 215, 216 n.1 (2d Cir. 1999), *abrogated in part on other grounds by Sarhank Group v. Oracle Corp.*, 404 F.3d 657, 660 n.2 (2d Cir. 2005); *Bingham, Ltd. v. United States*, 724 F.2d 921, 925 n.3 (11th Cir. 1984).[7]

---

[7] Under the last-antecedent rule of construction, therefore, the series "A or B with respect to C" contains two items: (1) "A" and (2) "B with respect to C." On the other hand, under the rule of grammar the series "A or B, with respect to C" contains these two items: (1) "A with respect to C" and (2) "B with respect to C." *See Kahn Lucas*, 186 F.3d at 216 n.1.

Compare the Fifth Amendment of the Constitution, which provides that no person shall "be deprived of life, liberty, or property, without due process of law." The comma before the phrase "without due process of law" indicates that the phrase

But neither of these aids in construction is dispositive; they serve only as guides. Moreover, the only other sentence in paragraph (d)(10)(i) fails to use this grammatical construction—in a situation where the modifying phrase almost certainly applies to all three elements in a series.[8]  Our confidence in paragraph (d)(10)(i)'s correct comma placement is thereby diminished. Thus we express no opinion on whether the deadline applied to Hercules. But our subsequent analysis makes clear that, even if there were a deadline imposed, the Commissioner extended it. So the question of whether there was a deadline need not be answered here.

**C.    If there was a deadline for interest-rate amendments, was it extended?**

For this analysis, we assume without deciding that a

---

modifies "life," "liberty," and "property."   This obviously follows the grammatical rule.

[8] That sentence refers to a "plan amendment that changes [1] the interest rate, [2] the time for determining the interest rate, or [3] the mortality assumptions *used for the purposes described in paragraph (d)(1)* . . . ."  Treas. Reg. § 1.417(e)-1(d)(10)(i) (emphasis added). There is no comma before the italicized phrase, but it appears that phrase is meant to modify all three items in the series. For example, paragraph (d)(1) discusses the present-value calculation, including the "applicable interest rate" and the "applicable mortality table."

deadline was imposed for plan amendments replacing the PBGC rate with the Treasury rate. We thus face two questions. First, did the Commissioner extend that deadline in Rev. Proc. 99-23? Second, did Rev. Proc. 99-23 meet the statutory and regulatory requirements for extending the deadline?

### 1. *Did Revenue Procedure 99-23 extend the deadline for interest-rate amendments?*

The Commissioner extended deadlines for certain plan amendments in three different Revenue Procedures. The first Revenue Procedure, issued in 1999, listed several kinds of plan amendments and extended the deadline for making those amendments. The second and third—issued in 2000 and 2001, respectively—extended further the 1999 extension. We will work backward to the 1999 Revenue Procedure—the 2000 and 2001 Revenue Procedures add little to our analysis here, as they simply extended the 1999 extension.

The three Revenue Procedures deal with, among other things, plan amendments following GUST changes. GUST is an acronym for a list of several laws,[9] but what is important here is

---

[9] The laws listed in the 1999 Revenue Procedure include the Uruguay Round Agreements Act, the Uniformed Services Employment and Reemployment Rights Act of 1994, the Small Business Job Protection Act of 1996, the Taxpayer Relief Act of 1997, and the Internal Revenue Service Restructuring and Reform Act of 1998. Rev. Proc. 99-23 § 2.01, 1999-16 I.R.B.

that GUST includes the Uruguay Round Agreements Act (which includes the Retirement Protection Act and the Treasury interest rate). Rev. Proc. 2000-27 § 1.02, 2000-26 I.R.B. 1272.

In Rev. Proc. 2000-27, the Commissioner extended the deadline for "all GUST plan amendments, including all those specifically enumerated in Rev. Proc. 99-23," to January 1, 2001. *Id.* §§ 4.01–.02. Revenue Procedure 2001-55 extended to February 28, 2002, the deadline for "all GUST plan amendments, including all those plan amendments specifically enumerated in Rev. Proc. 99-23." Rev. Proc. 2001-55 § 3.01, 2001-49 I.R.B. 552. Thus, whether Hercules had until February 28, 2002, to adopt its amendment depends on whether its plan amendment was covered by Rev. Proc. 99-23. We now move to that inquiry.

Revenue Procedure 99-23 extended to January 1, 2000, "the remedial amendment period under § 401(b) of the Code for amending plans that are qualified under § 401(a) . . . for . . . recent changes in the law." Rev. Proc. 99-23 § 1.01, 1999-16 I.R.B. 5. The Revenue Procedure noted, in its Purpose section, that it extended the time allowed for plans to adopt the Treasury interest rate for purposes of present-value calculations. *See id.* § 1.03. And in its Background section, it mentioned the Retirement Protection Act's replacing the PBGC interest rate with the Treasury interest rate. *Id.* §§ 2.07–.08.

---

5.

13

Section 3.06 of Rev. Proc. 99-23 is the key.  We quote it in full:

Finally, the extension of the remedial amendment period also applies to the time for adopting amendments of defined benefit plans to provide that benefits will be determined in accordance with the applicable interest rate rules and applicable mortality table rules of § 1.417(e)-1(d).  Thus, such a plan amendment may be adopted at any time up to the last day of the extended remedial amendment period, provided the amendment is made effective for distributions with annuity starting dates occurring in plan years beginning after December 31, 1999.  However, pursuant to the Commissioner's authority in § 1.401(b)-1T(c)(3), if such a plan amendment is adopted after the last day of the last plan year beginning before January 1, 2000, the amendment must provide that, with respect to distributions with annuity starting dates that are after the last day of that plan year but before the date of adoption of the amendment, the distribution will be the greater of the amount that would be determined under the plan without regard to the amendment and the amount determined under the plan with regard to the amendment.

14

*Id.* § 3.06.

In English, section 3.06 says this: This Revenue Procedure applies to amendments that replace the PBGC interest rate with the Treasury interest rate. Thus, those amendments can be made until January 1, 2000, as long as they are made effective for payments made on or after January 1, 2000. But if such an amendment is adopted after January 1, 2000, it cannot take effect retroactively. For the period between January 1, 2000, and the amendment adoption date, the plan must instead pay participants the greater of either (a) the amount due under the PBGC rate or (b) the amount due under the Treasury rate.

As the plain-English translation makes clear, Rev. Proc. 99-23 by its terms applied to the Hercules amendment. (It also makes clear that Hercules followed the Revenue Procedure's anti-retroactivity rules in the amended plan; as noted in footnote 2 above, Hercules gave participants the higher sum resulting from the PBGC- or Treasury-rate calculations until January 2002.)

Now we must determine whether Rev. Proc. 99-23 met the statutory and regulatory requirements for extending plan-amendment deadlines. If so, Rev. Proc. 99-23 and the subsequent Revenue Procedures extended the deadline for adopting the Treasury rate to February 28, 2002—and Hercules' amendment was adopted before that deadline. We address that question next.

15

**2.** *Did the Revenue Procedures meet the statutory and regulatory requirements to extend the deadline?*

Section 401(b) of the Code allows plans to qualify under § 401(a) via retroactive[10] amendment. The section basically provides that, if a plan is not effective in a given period, a retroactive, remedial amendment can make it effective for that period. *See* I.R.C. § 401(b). The Code authorizes the Secretary of the Treasury to set this remedial amendment period.[11] *See id.*

Accordingly, Treas. Reg. § 1.401(b)-1 further defines the Secretary's authority under § 401(b). The general rule is that a plan that does not satisfy § 401(a)'s requirements on any given day "shall be considered to have satisfied such requirements on such date if, on or before the last day of the remedial amendment period . . . with respect to such *disqualifying provision*," the plan is amended to meet all of those

---

[10] To dispel any confusion about section 1's discussion of "anti-retroactivity rules" and section 2's discussion of retroactivity, we note briefly that the anti-retroactivity rules set forth in Rev. Proc. 99-23 § 3.06 were simply limits on the retroactivity of interest-rate amendments. The Commissioner is empowered to impose limitations on retroactivity under Treas. Reg. § 1.401(b)-1(c)(3), and he did so in section 3.06.

[11] A remedial amendment period may also be extended. The Commissioner has the authority to extend any remedial amendment period at his discretion. *Id.* § 1.401(b)-1(f).

16

requirements by the end of the remedial amendment period, and those amendments are made retroactive to the beginning of the period. Treas. Reg. § 1.401(b)-1(a) (emphasis added). Thus, to take advantage of a retroactive amendment period, a plan must amend a "disqualifying provision."

In paragraph (b)(3), the Secretary grants the Commissioner authority to designate a "disqualifying provision." This paragraph reads:

> A [disqualifying provision is a] plan provision designated by the Commissioner, at the Commissioner's discretion, as a disqualifying provision that either—
>
> > (i) Results in the failure of the plan to satisfy the qualification requirements of the Internal Revenue Code by reason of a change in those requirements; or
> >
> > (ii) Is integral to a qualification requirement of the Internal Revenue Code that has been changed.

17

*Id.* § 1.401(b)-1(b)(3).[12]

Stepnowski concedes that section 3.06 of Rev. Proc. 99-23 complies with the Commissioner's discretionary designation requirements. His argument is therefore that the Commissioner could not extend the remedial amendment period for interest-rate amendments because Hercules' plan paid larger payments *before* it was amended. That is, Hercules did not need to amend the plan to satisfy the Retirement Protection Act because it was already paying more than the Act's required minimum. The Hercules plan was qualified under § 401(a) because it used the PBGC interest rate, Stepnowski argues, so this more favorable interest rate to him could not be a "disqualifying provision."

Stepnowski's argument fails because paragraph (b)(3) is written in the disjunctive. A "disqualifying provision" need not cause a plan to fail under § 401—although that is one definition of a "disqualifying provision" under Treas. Reg. § 1.401(b)-1(b)(3)(i). It can also be something that is simply "integral to a qualification requirement of the Internal Revenue Code that has been changed." *Id.* § 1.401(b)-1(b)(3)(ii). That is the issue before us; we address it in three brief points.

_____

[12] The Commissioner can only make such a designation in "revenue rulings, notices, and other guidance published in the Internal Revenue Bulletin." Treas. Reg. § 1.401(b)-1(c)(2). The three Revenue Procedures at issue were published in the Internal Revenue Bulletin.

First, the present-value provision is a "qualification requirement of the Internal Revenue Code." Section 401(a) describes the qualification requirements and refers to § 417 for provisions under which plan participants may choose lump-sum payments. I.R.C. § 401(a)(11)(F). Section 417(e)(3) in turn requires plans to use a minimum present-value calculation for such payments.

Second, the interest-rate provision is "integral" to the present-value provision. Section 417(e)(3)(A)(i) sets minimum requirements for present-value calculations, stating that "the present value shall not be less than the present value calculated by using the applicable mortality table and the applicable interest rate." And § 417(e)(3)(A)(ii)(II) defines the "applicable interest rate." What is integral is something that is "essential to completeness" or is "serving to form a whole." *Webster's Third New International Dictionary* 1173 (Philip Babcock Gove ed., 1971). The "applicable interest rate" is essential to the present-value calculation and therefore, by definition, integral.

Third, the interest-rate provision "has been changed." Congress replaced the PBGC rate in 1994, making the 30-year Treasury interest rate the "applicable interest rate." Retirement Protection Act § 767(a)(2), 108 Stat. at 5038.

The only remaining question is whether the Commissioner implicitly designated the interest-rate provision

19

as a disqualifying provision in Rev. Proc. 99-23.[13] We hold that he did for three reasons.

First, the Commissioner cannot extend a remedial amendment period for something that he did not designate as a disqualifying provision. *See* Treas. Reg. § 1.401(b)-1(a) (discussing a "remedial amendment period . . . with respect to [a] disqualifying provision"). Thus, the fact that the Commissioner extended the remedial amendment period for interest-rate amendments implies that he designated interest-rate provisions as "disqualifying provisions."

Second, the Commissioner expressly referred to his designation authority in requiring that the Treasury rate could not be imposed retroactively if adopted after January 1, 2000. The Revenue Procedure referred to "the Commissioner's authority in § 1.401(b)-1T(c)(3)" in setting out this requirement. Rev. Proc. 99-23 § 3.06. Section 1.401(b)-1T(c)(3) in the temporary regulations—now found in Treas. Reg. § 1.401(b)-1(c)(3)—allowed the Commissioner to impose additional rules on provisions designated as "disqualifying provisions."

---

[13] Although Stepnowski points to section 4 of Rev. Proc. 99-23 as an example of an explicit designation of an integral provision, *see* Rev. Proc. 99-23 § 4 ("Designation of plan provisions integral to § 415(e) as disqualifying provisions" (capitalization altered)), the Commissioner can designate "disqualifying provisions" implicitly as well—and did so here in section 3.06.

20

Remedial Amendment Period, 62 Fed. Reg. 41272, 41274 (Aug. 1, 1997) (codified at Treas. Reg. § 1.401(b)-1(c)(3)).

Third, and most importantly, the Commissioner in the 2000 Revenue Procedure recognized that all plan provisions "integral to a qualification requirement changed by GUST are disqualifying provisions under § 1.401(b)-1(b) of the regulations." Rev. Proc. 2000-27 § 4.02. Because the GUST plan amendments included the amendments "specifically enumerated in Rev. Proc. 99-23," *id.*, Rev. Proc. 99-23 designated the interest-rate provision as a "disqualifying provision." Therefore, even if Rev. Proc. 99-23 did not explicitly designate the interest-rate provision as a "disqualifying provision," Rev. Proc. 2000-27 did, so Hercules' amendment still fell within the deadline extended by the Commissioner.

The Commissioner—by expressly referring to his designation powers and by extending a remedial amendment period for interest-rate amendments—designated the interest-rate plan provision as a "disqualifying provision" under Treas. Reg. § 1.401(b)-1(b)(3) and I.R.C. § 401(b).

\* \* \* \* \*

We hold that the Commissioner extended—until February 28, 2002—the deadline for plans to amend their present-value calculations to switch from using the PBGC rate

21

to using the 30-year Treasury rate.  Because Hercules' plan was amended to adopt the Treasury rate before February 28, 2002, its plan amendment was not a cutback prohibited by § 411(d)(6). We therefore affirm the Tax Court's decision.