NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-3138
_____

IN RE: DIET DRUGS (PHENTERMINE/FENFLURAMINE/DEXFENFLURAMINE)
PRODUCTS LIABITY LITIGATION

Roberta Haberman,

Appellant

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action Nos. 2-99-cv-20593/ 2-12-MD-01203)
District Judge: Honorable Harvey Bartle, III

_____

Argued March 5, 2013

Before: RENDELL, AMBRO, and VANASKIE, <u>Circuit Judges</u>

(Opinion filed: May 21, 2013)

Howard J. Bashman, Esquire
Suite G-22
2300 Computer Avenue
Willow Grove, PA 19090

Stanley D. Hudson, Esquire
Kip A. Petroff, Esquire **(Argued)**
Petroff & Associates
3838 Oak Lawn Avenue, Suite 1620
Dallas, TX 75219

     Counsel for Appellant

Geoffrey J. Michael, Esquire

Arnold & Porter
555 Twelfth Street, N.W.
Washington, DC   20004

Raymond M. Williams, Esquire
DLA Piper
1650 Market Street
One Liberty Place, Suite 4900
Philadelphia, PA   19103

Jules S. Henshell, Esquire   **(Argued)**
Semanoff, Ormsby, Greenberg & Torchia
2617 Huntingdon Pike
Huntingdon Valley, PA   19006

Laurence S. Berman, Esquire
Michael D. Fishbein, Esquire
Arnold Levin, Esquire
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA   19106

Charles R. Parker, Esquire
Yetter & Coleman
909 Fannin Street, Suite 3600
Houston, TX  77010

Counsel for Appellees

——————————

OPINION

——————————

AMBRO, <u>Circuit Judge</u>

In November 1999, Wyeth L.L.C. ("Wyeth") entered into a nationwide class action settlement agreement (the "Settlement Agreement") related to its marketing of two weight-loss agents, fenfluramine/phentermine (known as "fen-phen") and dexfenfluramine, linked to the development of valvular heart disease.  When a patient

2

suffers from this condition, blood that is supposed to move in a forward direction through the heart leaks backward, or regurgitates, through the diseased valve. However, as the parties acknowledge, other factors can also cause or contribute to the development of this medical problem; we refer to these as alternative causation factors.

Under the Settlement Agreement, qualifying diet drug users suffering from valvular heart disease receive compensation based on their age and the severity level of their medical condition. In general, to qualify for these benefits, a claimant must be diagnosed as FDA Positive (having a requisite level of valvular regurgitation).

The Settlement Agreement has two payment matrices—Matrix A (which provides greater compensation) and Matrix B (which provides lesser compensation)—that are used to calculate the compensation a claimant will receive.[1] Matrix A applies to claimants who ingested diet drugs for fewer than 61 days and do not have any of the alternative causation factors listed by the Settlement Agreement. Matrix B applies to resolve all other qualifying claims. Claimants whose valvular heart conditions worsen to a higher severity level are permitted to file supplemental claims seeking additional benefits.

In 2010, Roberta Haberman—a class member who previously received compensation under the Settlement Agreement because she suffered from valvular heart disease[2]—filed a supplemental claim after undergoing dual heart valve surgery in 2009.

---

[1] Each Matrix has five severity levels and 11 age groups that determine the amount due to the claimant.
[2] In 2004, the Settlement Agreement was amended to establish a streamlined process for resolving the large number of low-level severity claims that had been filed by putative class members. The amendment did not use the payment matrices to determine the amount due to each claimant. Instead, claimants received a *pro rata* distribution from a

In her supplemental claim form, she asserted that she was entitled to Matrix A benefits. She based this claim for additional compensation on a 2002 echocardiogram showing that she had valvular heart disease and did not have any of the listed alternative causation factors. The AHP Settlement Trust (the "Trust"), which administers the settlement fund, rejected her request for Matrix A benefits. It determined that Matrix B applied to her claims because four echocardiograms performed between 2007 and 2009 showed that she had developed mitral annular calcification—one of the listed alternative causation factors—prior to her surgery. The District Court affirmed the Trust's determination, and Haberman subsequently filed this appeal.[3] Both the Trust and class counsel have filed briefs opposing her request for Matrix A benefits.

The question raised on appeal is whether the Settlement Agreement imposes a time limitation on the medical evidence upon which the Trust may rely in determining whether a claimant has an alternative causation factor. It is undisputed that FDA Positive regurgitation, which determines whether a claimant is entitled to Matrix benefits at all, must be diagnosed by an echocardiogram performed between beginning diet drug use and the end of the screening period on January 4, 2003. What the parties dispute is whether

newly created fund based on the review of their claims. Haberman was one of the class members covered by the amendment. She received a distribution of $122,687.57.

[3] The District Court had diversity jurisdiction pursuant to 28 U.S.C. § 1332. We have jurisdiction over this timely filed appeal under 28 U.S.C. § 1291. "We apply 'plenary review to a district court's construction of settlement agreements,' but we review any underlying factual findings for clear error." *In re Diet Drugs Prod. Liab. Litig.*, 706 F.3d 217, 223 n.4 (3d Cir. 2013) (quoting *Coltec Indus., Inc. v. Hobgood*, 280 F.3d 262, 269 (3d Cir. 2002)) (citing *In re Cendant Corp. Prides Litig.*, 233 F.3d 188, 193 (3d Cir. 2000)).

this same limitation applies to the diagnosis of alternative causation factors. Because the screening period ended on January 4, 2003, application of this limitation would preclude the Trust from relying on the echocardiograms performed between 2007 and 2009 to determine whether Haberman's claim should be resolved under Matrix A or Matrix B.

Settlement agreements are interpreted according to "basic contract principles." *In re Cendant Corp.*, 233 F.3d at 193. Under Pennsylvania law,[4] when a term in an agreement is clear and unambiguous, its meaning "must be determined from the four corners of the contract." *Glenn Distribs. Corp. v. Carlisle Plastics, Inc.*, 297 F.3d 294, 300 (3d Cir. 2002) (citing *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982)). In contrast, "if the written contract is ambiguous, a court may look to extrinsic evidence to resolve the ambiguity and determine the intent of the parties." *Id.* (citing *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 93 (3d Cir. 2001)).

We believe the Settlement Agreement is unambiguous in not placing a time limit on the medical evidence on which the Trust can base its determination of whether an alternative causation factor is present. The relevant provision of the Settlement Agreement states that Matrix B applies to "Diet Drug Recipients who ingested [diet drugs] for sixty-one (61) or more days, who were diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period, *with any of the following conditions*." J.A.

---

[4] The parties do not address what jurisdiction's law is applicable. We have previously applied Pennsylvania law in interpreting the Diet Drugs settlement. *See In re Diet Drugs.*, 706 F.3d at 223 n.5. We presume that Pennsylvania law applies here as well.

at 75–77 (emphasis added).  It then lists a series of conditions, the alternative causation factors, among which is mitral annular calcification.  *Id.* at 76.

On its face, the provision refers to "Diet Drug Recipients" who have "any of the following conditions."  The commas separating "who who were diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period" support this literal reading.  In addition, some of the alternative causation factors contain their own timeframes that preclude them from being diagnosed by an echocardiogram performed between the outset of diet drug use and the end of the screening period.  One of the factors listed, for example, is "FDA Positive regurgitation (confirmed by Echocardiogram) prior to [diet drug] use for the valve that is the basis of the claim."  *Id.* at 77.  This alternative causation factor must expressly be diagnosed before, not after, the beginning of diet drug use.[5]

Haberman's argument that the temporal limitation does apply to the diagnosis of alternative causation factors primarily relies on the rule of the last antecedent.  This "rule generally holds 'that qualifying words, phrases, and clauses are to be applied to the words or phrase immediately preceding and not to others more remote.'"  *Stepnowski v. C.I.R.*, 456 F.3d 320, 324 (3d Cir. 2006) (quoting *United States v. Hodge*, 321 F.3d 429, 436 (3d Cir. 2003)).  Applying this rule, Haberman argues that "the phrase *with any of the*

---

[5] Moreover, at least one other alternative causation factor—a "[h]istory of daily use of methysergide or ergotamines for a continuous period of longer than 120 days"— presumably cannot be diagnosed by an echocardiogram at all.  *Id.*

*following conditions* modifies the immediately preceding phrase *who were diagnosed*."

Appellant's Br. at 26–27 (emphases in original).

We do not agree that the last-antecedent rule requires us to adopt this reading of the provision. The rule of the last antecedent, despite its name, is a guide, not a binding rule of interpretation. *Stepnowski*, 456 F.3d at 324. As discussed, applying this limitation to the diagnosis of all alternative causation factors would be, among other things, at odds with the literal words as well as the timeframes that the Settlement Agreement provides for some of those factors.

\*  \*  \*  \*  \*

To summarize, Haberman argues that the Settlement Agreement prohibits the Trust from relying on four echocardiograms conducted between 2007 and 2009 to determine whether she was entitled to Matrix A or Matrix B benefits. The Agreement, however, does not impose that limitation. Accordingly, we affirm the District Court's order denying her challenge to the Trust's determination that she is not entitled to Matrix A benefits.