In re **THE BAPTIST HOME OF PHIL-ADELPHIA d/b/a Deer Meadows Retirement Community, et al.,**[1] **Debtors.**

**Bankruptcy No. 14–13305 ELF.**

United States Bankruptcy Court, E.D. Pennsylvania.

Signed Dec. 31, 2014.

1. The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number are: The Baptist Home of Philadelphia d/b/a Deer Meadows Retirement Community (4330) and The Baptist Home Foundation (7309).

John T. Carroll, III, Cozen O'Connor, Wilmington, DE, for Debtor.

Dave P. Adams, United States Trustee, Philadelphia, PA, for U.S. Trustee.

Donald J. Detweiler, Francis J. Lawall, John Henry Schanne, II, Pepper Hamilton LLP, Wilmington, DE, Aris J. Karalis, Robert W. Seitzer, Maschmeyer Karalis P.C., Philadelphia, PA, for Creditor Committee.

## MEMORANDUM

ERIC L. FRANK, Chief Judge.

### I. INTRODUCTION

The Baptist Home of Philadelphia ("the Debtor"), a nonprofit corporation, filed this chapter 11 bankruptcy case on April 25, 2014. At the time, the Debtor operated a senior care facility with 206 licensed skilled nursing beds and 126 independent living and personal care units in the northeast section of the City of Philadelphia.

In its bankruptcy schedules, the Debtor disclosed two (2) secured debts—approxi-

mately $24 million owed to U.S. Bank, N.A., Indenture Trustee ("the Bond Trustee")[2] and approximately $6.4 million owed to Beneficial Mutual Savings Bank ("Beneficial"). Based on the filed claims, the Debtor also has approximately $6.3 million in general unsecured debt and $260,000 in priority debt.[3] On May 6, 2014, the U.S. Trustee appointed an official committee of unsecured creditors ("the Committee"). The Committee has actively participated in the case.

Presently before the court is the Joint Motion of the Debtor and the Bond Trustee for Relief from the Automatic Stay ("the Motion") (Doc. # 399). In the Motion, the Debtor and the Bond Trustee seek authorization for a pre-confirmation distribution on account of the Bond Trustee's claim. All interested parties, including the Committee, agree that a pre-confirmation distribution to the Bond Trustee is in the best interests of the estate and creditors and that a complete payoff of the Bond Trustee's claim is desirable. Interest on the Bond Trustee's claim is running at the rate of more than $3,000 per day. Confirmation of the Debtor's proposed chapter 11 plan is not likely to occur until at least February 2015. A pre-confirmation payoff of the Bond Trustee's claim prior to confirmation would eliminate the interest running on the bond debt as well as terminate ongoing legal expenses that are part of the Bond Trustee's secured claim. These potential savings are substantial and would inure to the benefit of the unsecured creditors.

Before a complete distribution to the Bond Trustee may be made, a dispute must be resolved regarding the appropriate amount of the distribution necessary to pay off the Bond Trustee's claim. The dispute arises from divergent interpretations of a settlement agreement ("the Settlement Agreement" or "the Agreement") approved by this court in June 2014. The parties refer to the dispute as "the Carve–Out Dispute" (the nature of which is discussed below) and the parties report that the amount at issue is approximately $460,000.00. Resolution of the Carve–Out Dispute is important to all parties because once the extent of the Bond Trustee's distribution entitlement is known, the court can authorize distribution of the balance of the Bond Trustee's claim, thereby terminating the accrual of interest and expenses.

By order dated December 18, 2014, I granted the Motion in part and entered an interim order authorizing the Debtor to pay the Bond Trustee's claim less the roughly $460,000.00 at issue in the Carve–Out Dispute ("the Holdback"). (Doc. # 188). The specific issue before the court is whether the Bond Trustee or the Committee has the superior claim to the Holdback in the event that the ultimate distribution in the case is insufficient to pay in full both the Bond Trustee's claim and the allowed unsecured claims.

For the reasons explained below, I conclude that the Bond Trustee has the superior claim to the Holdback based on the plain meaning of the Settlement Agreement. Therefore, I will enter an order authorizing the Debtor to distribute the Holdback to the Bond Trustee.

## II. THE "CARVE–OUT" DISPUTE

### A.

In the early stages of the case, a number of disputes arose among the parties in

---

2. This debt arose from certain revenue bond transactions that occurred in 1998.

3. None of the dollar amounts stated in the text are exact or intended to be binding. They are sufficiently accurate for the limited purposes of this Memorandum.

interest concerning, *inter alia,* the: (1) terms for use of cash collateral; (2) validity and relative priority of Beneficial's asserted security interest in certain assets; and (3) procedures for a proposed sale of substantially all of the Debtor's assets, including the terms for retention of a financial advisor and investment banker. The parties reached a global settlement of these disputes. After notice and hearing the Settlement Agreement was approved by the court on June 27, 2014. (Doc. # 188).

The Settlement included provisions that resolved the dispute over Beneficial's lien status and provided for certain "carve-outs" from secured property for the benefit of unsecured creditors.

Several components of the Settlement Agreement bear upon the present dispute.

Sections 6 and 7 of the Settlement Agreement resolved the dispute concerning Beneficial's lien position by:

4. Section 6.2 of the Settlement Agreement provided:

> The Rule 9019 Order shall include a grant of relief from the automatic stay to Beneficial Bank upon the occurrence of the Effective Date for the limited purpose of permitting Beneficial Bank to set off and apply (i) the Securities Proceeds and (ii) any of the Debtors' cash that is frozen in Beneficial Account No. 6188001371 (together with the Securities Proceeds, the "Beneficial Retained Collateral") against the amounts due and owing from the Debtors to Beneficial Bank under the Line of Credit Note, dated January 22, 2008, and the Line of Credit Note, dated May 9, 2008 (together, the "Beneficial Bank Notes"). Such relief from the automatic stay shall be conditioned upon and subject to Beneficial Bank's compliance with the provisions of section 7.1 of this Agreement.

5. Section 7.1 of the Settlement Agreement provided:

> After the Effective Date and concurrent with the setoff and application of the Bene-

(1) validating Beneficial's lien against some, but not all, of its claimed collateral;

(2) allowing Beneficial to liquidate and set off its claim against that agreed upon collateral;[4]

(2) requiring Beneficial to "carve-out" $625,000.00 from the proceeds of its collateral for the benefit of unsecured creditors ("the Beneficial Carve–Out");[5] and

(3) allowing Beneficial an unsecured claim to the extent that its entire claim was not satisfied by the liquidation of the collateral.[6]

Section 7 of the Settlement Agreement also provided for a carve-out from the proceeds of the Bond Trustee's collateral for the benefit of unsecured creditors. The parties included Beneficial within the class of unsecured creditor to the extent it was undersecured, but subject to certain limitations on Beneficial's. This carve-out from the Bond Trustee's collateral[7] con-

> ficial Retained Collateral in accordance with section 6.2 of this Agreement, Beneficial Bank shall carve-out from the Beneficial Retained Collateral and any unrestricted funds from Account 6339 and deposit $625,000.00 (the "Beneficial Carve–Out") in an escrow account with U.S. Bank National Association for the benefit of holders of allowed general unsecured claim....

6. Section 6.4 of the Settlement Agreement provided that Beneficial would have an allowed unsecured claim, once the deficiency between its entire claim and the net amount realized from the liquidation and set off of the agreed deposit and securities accounts could be calculated. (The net amount realized is reduced by the $625,000.00 carve out).

7. Section 7.4 of the Settlement Agreement also provided for a carve-out from the Bond Trustee's cash collateral prior to a sale for the benefit of the fees and expenses of the Committee's professionals.

sisted of two (2) separate funds (collectively, "the Bond Trustee Carve–Out"): [8]

(1) a flat $125,000.00 ("the Sale Proceeds Carve–Out") shared by all unsecured creditors other than Beneficial; [9]

(2) a percentage of the gross sales proceeds from the collateral, ranging from 5% and increasing up to 7% as the gross sales proceeds increased ("the Percentage Sharing Carve–Out"), with Beneficial splitting the Percentage Sharing Carve–Out with the other unsecured creditors on a 35%–65% basis. [10]

Third, the Settlement Agreement imposed two (2) conditions subsequent with respect to the Bond Trustee Carve–Out. The Bond Trustee Carve–Out would be voided if the Committee or any Committee members (other than Beneficial) supported or did not oppose a plan of reorganization that did not provide for full payment of the Bond Trustee's allowed claim in full. [11]

8. To be clear, the Bond Trustee–Carve–Out and the Holdback are different terms for the same thing.

9. Section 8 of the Settlement Agreement also excluded Beneficial from sharing in any distribution derived from recoveries in any actions prosecuted under chapter 5 of the Bankruptcy Code.

10. Section 7.2 of the Settlement Agreement provided:

(a) Upon a sale or another disposition approved by the Trustee of all or part of the Trustee's Collateral, the Trustee shall carve-out from the proceeds thereof for the sole and exclusive benefit of holders of allowed general unsecured claims, except as noted in subsection (b) below, an amount equal to:
(i) $125,000.00 (the "Sale Proceeds Carve–Out"), plus
(ii) 5% of any such sale proceeds (on a gross basis) between $19,000,000.00 and $21,000,000.00, 6% of any such sale proceeds (on a gross basis) between $21,000,000.01 and $22,000,000.00, and 7% of any such sale proceeds (on a gross basis) in excess of $22,000,000.00 up to the amount needed to satisfy the Trustee's allowed claim (the "Percentage Sharing Carve–Out" and, collectively with the Beneficial Carve–Out and the Sale Proceeds Carve–Out, the "Unsecured Creditors' Carve–Out").
(b) The Percentage Sharing Carve–Out shall be split among Beneficial Bank and all other holders of allowed general unsecured claims (excluding, however, any allowed unsecured deficiency claim of the Trustee) as follows: (i) 35% of the Percentage Sharing Carve–Out shall be distributed to Beneficial Bank; and (ii) 65% of the Percentage Sharing Carve–Out shall be distributed to all other holders of allowed general unsecured claims.

11. Section 12(a) of the Settlement Agreement provided, in pertinent part:

The Committee agrees that if (1) it supports or does not affirmatively oppose any proposed plan of reorganization or plan of liquidation which does not pay the Trustee's allowed claim in full in cash, or provide some other treatment agreed to by the Trustee, or (2) any of its members, excluding Beneficial Bank, supports or votes in favor of any proposed plan of reorganization or plan of liquidation which does not pay the Trustee's allowed claim in full in cash, or provide some other treatment agreed to by the Trustee ... then in either case on the effective date of such plan (unless the Trustee consents otherwise): (i) the Unsecured Creditors' Carve–Out shall immediately and irrevocably no longer be held or available for the benefit of holders of allowed unsecured claims; (ii) the Unsecured Creditors' Carve–Out shall be deemed to be collateral of the Trustee in which the Trustee has a perfected first-priority security interest and all funds on account of the Unsecured Creditors' Carve–Out held (or to be held) in escrow shall automatically and irrevocably be deemed held in trust for the benefit of the Trustee ... and (iv) none of the Debtors' estates, the Committee (or its members), Beneficial Bank, or any other party in interest shall have any rights, interests, or claims in and to the Unsecured Creditors' Carve–Out, or any funds deposited in escrow on account of the same or the proceeds thereof.

Also, the unsecured creditors could not receive any interest on their claims until the claims of the Bond Trustee and Beneficial were paid in full.[12]

### B.

After the Settlement Agreement was approved, the Debtor conducted, and the court later approved, a sale of virtually all of the Debtor's assets to a third party. The sale has closed and resulted in net proceeds in excess of $31 million. The parties are cautiously optimistic that the sale proceeds will be enough to pay all claims in full, but there is some uncertainty. The dispute arises from that uncertainty and involves the allocation of the risk of nonpayment. The question is whether the Bond Trustee or the unsecured creditors should bear the risk of nonpayment if the distribution is insufficient to pay all creditors in full. For example, if the shortfall is $460,000.00 (the amount of the Holdback), which constituency should be paid in full and which constituency should receive a distribution with a $460,000.00 shortfall?

The Debtor and the Bond Trustee assert that the Bond Trustee Carve–Out, entered into before the parties knew how successful the asset sale would be, constituted only "down-side" protection to the unsecured creditors in the event that the sale price was less than the Bond Trustee's allowed secured claim; in effect, the Bond Trustee Carve–Out provided a guaranteed minimum distribution derived from proceeds of the Bond Trustee's collateral that, in the absence of the Settlement Agreement, would have been distributed to the Bond Trustee, not the unsecured creditors. According to the Debtor and the Bond Trustee, once the sale proceeds exceeded the minimum distribution guaranteed by the Settlement Agreement (*i.e.*, the Bond Trustee Carve–Out of $460,000.00), the balance of the sale proceeds should be distributed according to ordinary principles of priority (meaning, paid first to satisfy the Bond Trustee's lien). In their view, if there are insufficient funds to pay unsecured creditors in full, after satisfaction of the Bond Trustee's allowed secured claim, the unsecured creditors must bear the loss.

The Committee and Beneficial contend that the Bond Trustee Carve–Out was a transfer of its right to full payment of its claim—in effect, either a conditional reduction of its allowed secured claim in the amount of the carve-out, or a subordination of a portion of the Bond Trustee's claim to a position junior to the unsecured claims.[13]

Interestingly, the parties on both sides of the question contend that there is no ambiguity in the Settlement Agreement and that their respective positions are supported by the plain language and meaning of the Settlement Agreement.

---

**12.** Section 10 of the Settlement Agreement provided, in pertinent part:

> [T]he Committee, on behalf itself and holders of allowed unsecured claims, agrees that, as a condition to the application of the Unsecured Creditors' Carve–Out for the benefit of holders of allowed unsecured claims (other than any such claims held by Beneficial Bank and the Trustee), such holders shall not collect any interest or fees on account of their allowed unsecured claims unless and until the allowed claims

of Beneficial Bank and the Trustee are paid in cash in full.

**13.** According to Beneficial: "[T]he Settlement Agreement expressly contemplates that the general unsecured creditors might be paid in full before the Trustee has fully recovered on its claims and requires catch-up payments to the Trustee before general unsecured creditors may receive interest on their claims." (Beneficial's Brief at 2).

## III. APPLICABLE LEGAL PRINCIPLES

The legal principles to be applied in this matter are well settled.

■ A settlement agreement is treated as a contract and its meaning is determined by employed general rules of contract interpretation. *See, e.g., Blunt v. Lower Merion School Dist.*, 767 F.3d 247, 282 n. 50 (3d Cir.2014). *In re Cendant Corp. Prides Litig.*, 233 F.3d 188, 193 (3d Cir.2000). "The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties." *Great American Ins. Co. v. Norwin School Dist.*, 544 F.3d 229, 243 (3d Cir.2008) (quoting *Murphy v. Duquesne University*, 565 Pa. 571, 777 A.2d 418 (2001) and applying Pennsylvania law).[14]

■ When the terms of a contract are clear and unambiguous, their meaning is determined from the four corners of the contract. *See, e.g., Bohler–Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 92 (3d Cir.2001).[15] However, if the written contract is ambiguous, the parties may offer, and the court may consider, extrinsic evidence to assist the court in resolving the ambiguity and determining the intent of the parties. *E.g., In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Product Liability Litigation*, 706 F.3d 217, 223–24 (3d Cir.2013); *Bohler–Uddeholm America*, 247 F.3d at 93.

■ The determination whether a contract is ambiguous is a question of law determined by the court. *E.g., McDowell v. Phila. Hous. Auth.*, 423 F.3d 233, 238 (3d Cir.2005). The court makes this determination by considering, from an objective standpoint, whether the language in the contract is reasonably susceptible to at least two (2) different interpretations. *E.g., USX Corp. v. Penn Cent. Corp.*, 130 F.3d 562, 566 (3d Cir.1997); *In re Garman*, 413 B.R. 215, 223 (Bankr.E.D.Pa. 2009). In making the determination whether an ambiguity exists, "a court must

---

14. The Settlement Agreement provides that the court should apply Pennsylvania in construing its meaning. (*See* Settlement Agreement § 14.4). No party has contended otherwise.

15. The parol evidence rule prohibits the admission of extrinsic evidence of prior or contemporaneous oral agreements, or prior written agreements, to explain the meaning of a contract when the parties have reduced their agreement to an unambiguous integrated writing. *E.g., Prior v. Innovative Communs. Corp.*, 207 Fed.Appx. 158 (3d Cir.2006) (nonprecedential) (citing Richard A. Lord, *Williston on Contracts*, § 33 (4th ed. 1999)). In order to determine whether the parol evidence rule bars the admission of evidence, the court must first determine whether the contract is fully integrated. *Claret Capital Nominees v. John Benett*, 2010 WL 300288, at *3 (E.D.Pa.2010); *Restatement (Second) of Contracts* § 209(2) (whether a contract is fully integrated is "a question preliminary to determination of a question of interpretation or to application of the parol evidence rule"). A written contract is integrated if it represents a final and complete expression of the parties agreement. *Kehr Packages v. Fidelity Bank, N.A.*, 710 A.2d 1169, 1173 (Pa.Super.Ct.1998) (citing *Lenzi v. Hahnemann University*, 445 Pa.Super. 187, 664 A.2d 1375, 1379 (1995)). In determining whether the contract is fully or only partially integrated, courts consider whether the contact contains a merger or integration clause, the length and detail of the contract, the formality of the setting, and whether the contract is a form. *See* 6 *Corbin on Contracts* § 25.7 (LexisNexis 2011).

The Settlement Agreement includes an integration clause. (Settlement Agreement § 14.5 ("This Agreement constitutes the complete agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto"). All the parties agree that it is an integrated agreement.

consider the words of the agreement, alternative meanings suggested by counsel, and extrinsic evidence offered in support of those meanings."[16] *Kroblin Refrig. Xpress, Inc. v. Pitterich*, 805 F.2d 96, 101 (3d Cir.1986); *accord Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir.1994); *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir.1980). In evaluating the language of the contract, a court should give the words their plain and ordinary meaning. *Blunt*, 767 F.3d at 282 n. 50. A contract is not rendered ambiguous merely because the parties do not agree on its meaning. *See, e.g., Diet Drugs*, 706 F.3d at 224; *Garman*, 413 B.R. at 223.

## IV. DISCUSSION

### A.

I agree with the Debtor and the Bond Trustee that the Settlement Agreement unambiguously expressed the parties' intent to provide a minimum recovery to unsecured creditors from the sale proceeds derived from the Bond Trustee's collateral and was not intended to reduce the Bond Trustee's allowed secured claim or subordinate any portion of that claim in favor of the unsecured creditors.

### 1.

The most compelling indication of the parties' intent is their unqualified use of the words *"carve-out from the proceeds"* of the Bond Trustee's collateral. (Settlement Agreement § 7.2(a)).

The words "carve-out" and "proceeds," used together, strongly suggest that the parties agreed that the Bond Trustee would allocate a fixed sum from the proceeds of its collateral (calculated under § 7.2(a)) to be distributed for the benefit of unsecured creditors. Through the relatively sparse language of the Settlement Agreement, the parties agreed to alter the Bankruptcy Code distribution scheme by giving the unsecured creditors a limited priority in the distribution of the proceeds of the collateral. I see nothing more than that in the words of the Settlement Agreement.

The Settlement Agreement verbiage is economical because the term carve-out has an understood meaning in the bankruptcy community.

The term "carve out" is one of those uniquely bankruptcy phrases, much like

---

**16.** The Third Circuit Court of Appeals has pointed out that there are limits to the scope of the court's consideration of extrinsic evidence in determining whether an ambiguity exists:

> It is important for present purposes to note that extrinsic evidence of the negotiations, conduct and other circumstances of the parties is important to a court's analysis of whether an agreement is ambiguous only to the extent, if any, that such evidence provides objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings. That is, extrinsic evidence is permitted because the law recognizes that the meaning of words can depend on context, and what may seem unambiguous without context (or in the context that the judge may hypothesize, based on his or her own experience) may be ambiguous when understood from the linguistic reference point of the parties. But the focus must remain on the language chosen by the parties, and a text unambiguous when accorded the commonly understood meaning of its words cannot be disregarded unless the extrinsic evidence is such as might cause a reasonable fact finder to understand the text differently.

*American Cyanamid Co. v. Fermenta Animal Health Co.*, 54 F.3d 177, 181–82 (3d Cir.1995) (quotation marks and citations omitted).

In this case, no party has offered any extrinsic evidence in an effort to establish that an ambiguity exists. To the contrary, all of parties argue that the contract is unambiguous making all resort to extrinsic evidence unnecessary.

"cram down," that appears nowhere in the bankruptcy statute but connotes definite meaning to parties. It is an agreement by a party secured by all or some of the assets of the estate to allow some portion of its lien proceeds to be paid to others, *i.e.*, to carve out of its lien position. *It commonly arises in two contexts. The first, applicable here, is where there are no unliened assets and the lien creditor agrees to release funds to unsecured creditors as an incentive to the Chapter 7 trustee to administer the assets.* Carve outs are also common in Chapter 11 cases in favor of debtor's attorneys as part of cash collateral agreements

*In re White Glove, Inc.*, 1998 WL 731611, at *6 (Bankr.E.D.Pa. Oct. 14, 1998).

The instant case is analogous to the first of the two situations described in the passage quoted above, albeit in the chapter 11 sale context, rather than in the chapter 7 sale context (a distinction that is immaterial for present purposes). As *White Glove* indicates, the use of the word carve-out usually connotes to bankruptcy professionals that although there may be no unencumbered assets for distribution to unsecured creditors, it may be in the interest of the secured and unsecured creditors alike to liquidate the collateral in the bankruptcy case. For unsecured creditors, the carve-out agreement may represent their only chance of obtaining any distribution on their claims. For the secured creditor, the carve-out agreement manifests its business judgment that it is in its interest to pay over some portion of the proceeds of its collateral to unsecured creditors as a condition of liquidating the collateral promptly through the bankruptcy process. Typically, under a carve-out agreement, the secured creditor takes on no obligation other than the payment of the agreed amount of the carve-out. Other than accounting to the bankruptcy estate for the agreed upon carve-out, the secured creditor's rights in the balance of the proceeds of its collateral are unimpaired.

In this case, had the parties intended anything other than the limited alteration in ordinary bankruptcy distribution principles described above, the sophisticated parties and counsel that negotiated the agreement necessarily would have drafted additional provisions to make that intent clear. Such provisions likely would have employed words other than the single phrase, "carve-out from proceeds." Undoubtedly, the additional provisions would have made reference to a "reduction" or "subordination" or "limitation" of the Bond Trustee's claim; or to a "gift" of the Trustee's "recovery" or "distribution rights" to the general unsecured creditor class; or the like. But the Settlement Agreement contains no such language.[17]

Instead, § 7.2(a)(ii) manifests the parties' intention that the Bond Trustee claim is to be paid in full, subject to the carve-out.

Section 7.2(a) provides for a carve-out of a specific percentage of the sale proceeds based upon a formula. The less realized from the sale, the lower the percentage would be in computing the carve-out. For instance, if the sale realized between $19 million and $21 million, the Bond Trustee

---

17. The Debtor summed it up well in its brief: Given the sophistication of the parties involved in negotiating and drafting the ... Settlement Agreement, it cannot be argued credibly that a concession so profound on the part of the [Bond] Trustee—an agreement that, even if comfortably oversecured,

the [Bond] Trustee would not receive payment in full of its allowed claim unless and until each and every other creditor in the case was paid in full—would be baked implicitly into the term "carve-out".
(Debtor's Brief at 4).

would carve out only 5% of those proceeds for the allowed general unsecured claim holders. Similarly, if the sale realized between $21 million and $22 million, the carve-out would be supplemented by 6% of those additional proceeds. Most telling is the next step in the formula. If the sale proceeds exceeded $22,000,000, the carve out would be supplemented further by 7% of the additional proceeds, but only up to "the amount needed to satisfy the Trustee's allowed claim." *Thus, the carve-out ceases once the proceeds equal the amount of the Bond Trustee's claim.* This is a clear indicator that the carve-out provided unsecured creditors with no claim to any proceeds of collateral in excess of the "the amount needed to satisfy the Trustee's allowed claim." Yet, that is exactly what the Committee seeks in arguing that proceeds received in excess of the amount of the Bond Trustee's allowed claim should be paid to the unsecured creditors ahead of the Bond Trustee in the event that both constituencies cannot be paid in full.[18]

### 2.

As the Debtor and the Bond Trustee point out, their straightforward reading of the meaning of § 7.2(a) of the Settlement Agreement is reinforced by § 12(a) of the Agreement. Section 12(a) voided the Bond Trustee Carve–Out, if the Committee, or any Committee members (other than Beneficial) supported or did not oppose a plan of reorganization that did not provide for full payment of the Bond Trustee's allowed claim in full. Unless § 7.2(a) is interpreted to mean that the Bond Trustee agreed to reduce its allowed secured

claim by the amount of the Bond Trustee Carve–Out (a concept that is nowhere expressed in the Settlement Agreement), § 12(a) evinces the parties' intention that the Bond Trustee's claim be paid in full. Section 12(a) is difficult, if not impossible, to reconcile with an interpretation of the Settlement Agreement in which some portion of the Bond Trustee's claim (measured in the amount of the Bond Trustee Carve–Out) is either reduced by the amount of the carve-out or subordinated to the unsecured claims.

### B.

Notwithstanding the straightforward reading of the carve-out provisions of the Settlement Agreement set out above, the Committee and Beneficial insist that the Settlement Agreement provided for unsecured creditors to be paid in full ahead of the Bond Trustee to the extent of the amount of the Bond Trustee Carve–Out. Their main argument is one of negative implication.

The Committee and Beneficial compare § 6.4 and § 7.2 of the Settlement Agreement. Section 6.4, which provides for the Beneficial Carve–Out to unsecured creditors, includes a mechanism for calculating Beneficial's allowed unsecured claim. Section 7.2, which provides for the Bond Trustee Carve–Out, lacks any similar mechanism for the calculation of a Bond Trustee deficiency claim. Based on the use of the same word—"carve-out"—in both provisions, the Committee and Beneficial argue that the Settlement Agreement necessarily was intended to treat the Bond Trustee

---

**18.** The "ceiling" in the carve-out calculation also demonstrates that the carve-out was designed to provide exactly the type of "downside" protection suggested by the Bond Trustee and the Debtor.

Assume, for example, that the sale proceeds happened to equal the exact amount of the

Bond Trustee's allowed secured claim. Absent the carve-out, all of the proceeds would be distributed to the Bond Trustee, leaving nothing for the unsecured creditors. The carve-out formula, as negotiated, provided for a minimum recovery for unsecured creditors in that event.

and Beneficial in the same way following the carve-out. Specifically, they contend that just as the Beneficial Carve–Out reduced its allowed secured claim by the amount of the Beneficial Carve–Out, so too the Bond Trustee reduced its allowed secured claim by the amount of the Bond Trustee Carve–Out (or at least subordinated its right to receive a distribution on the amount of the carve-out until after unsecured creditors were paid in full).

As stated earlier, this argument reads far too much into the use of the word "carve-out" in the two (2) sections of the Settlement Agreement. It also fails to account for the different positions of Beneficial and the Bond Trustee at the time the parties entered into the Agreement.

It is obvious from § 6.4 of the Settlement Agreement that the parties contemplated as a virtual certainty that Beneficial's allowed claim would be undersecured after it ceded its claim to certain collateral and provided for the Beneficial Carve–Out. This is likely because the parties knew that the value of the deposit and investment accounts serving as Beneficial's collateral could not possibly satisfy Beneficial's claim in full (especially after the Beneficial Carve–Out). The same cannot be said regarding the Bond Trustee's collateral, which was of an entirely different nature. The parties did not know what the sale of the Bond Trustee's collateral would bring. Certainly, there was the possibility that the Bond Trustee's claim would be undersecured, but the Settlement Agreement did not assume that would be the case. (And, as it turns out, once the actual sale of the collateral took place, the Bond Trustee's claim was not undersecured). This difference in status of the two (2) secured creditors, by itself, reasonably accounts for the differences in the two sections of the Agreement.

The Committee and Beneficial also make an untenable inference when they suggest that the absence of a mechanism in § 7.2 for determining and allowing as an unsecured claim any undersecured portion of the Bond Trustee's claim, juxtaposed against the provisions in § 6.4 for determining and allowing Beneficial's allowed unsecured claim, demonstrates that the Bond Trustee was waiving its right to payment of the amount of the Bond Trustee Carve–Out or was subordinating its secured claim to that extent of that carve-out. A far more compelling explanation for the absence of a mechanism in § 7.2 for calculating the Bond Trustee's potential unsecured claim is that the parties had no need to include such provisions in the Settlement Agreement. This is so because, absent an agreement, any unsecured claim that the Bond Trustee might hold would be determined in accordance with the applicable provision of the Bankruptcy Code, i.e., 11 U.S.C. § 506(a). Under § 506(a), the Bond Trustee's allowed secured claim would be determined based on the extent of the proceeds available for payment of its claim after payment to the unsecured creditors of the distribution guaranteed by the Bond Trustee Carve–Out. The most natural interpretation of § 7.2 is that it deferred the claims allowance process to the Bankruptcy Code and the Bankruptcy Rules.[19]

19. In support of its interpretation, Beneficial points to § 10 of the Settlement Agreement, which provides that unsecured creditors (other than Beneficial) may not collect any interest on their claims "unless and until the allowed claims of Beneficial Bank and the Trustee are paid in cash in full."

Certainly, § 10 seems unnecessary in that under the Bond Trustee's interpretation of the Agreement, unsecured creditors may not receive full payment of the principal amount of their claims, much less interest on such claims, until the Bond Trustee's allowed claim has been paid in full from the proceeds

## C.

In the end, the Committee and Beneficial conflate the relatively simple concept of a "carve-out from proceeds of collateral," as it is commonly understood in bankruptcy practice, with the concepts of claims allowance or subordination. Their arguments are clever and creative,[20] but they strain to, and ultimately find no support in, the plain language of the Settlement Agreement.

■ From an objective standpoint, I conclude that there is no ambiguity in the Settlement Agreement and it is not susceptible to the interpretation urged by the Committee and Beneficial. The plain language of the Settlement Agreement provided only for a guarantee of a minimum distribution to the unsecured creditors from the Bond Trustee's collateral in an amount that increased as the sales proceeds increased, but that also was capped once the sales proceeds equaled the amount of the Bond Trustee's claim. So long as the Bond Trustee provides the agreed funds for distribution to unsecured creditors in the amount required by § 7.2 of the Settlement Agreement, its rights in the collateral (and the proceeds thereof) were not impaired by the Settlement Agreement and the Committee and Beneficial will receive what they bargained for in the Settlement Agreement. Put another way, subject to its commitment to fund the agreed carve-out, the Bond Trustee is entitled to realize the balance of the proceeds of its collateral in satisfaction of its allowed secured claim. To the extent that the balance of those proceeds are insufficient to pay both the Bond Trustee and the unsecured creditors in full, the unsecured creditors must bear the risk of loss.

of the collateral (and after payment of the Bond Trustee Carve–Out to the unsecured creditors). And, I acknowledge that an interpretation that arguably may render a contract provision surplusage is disfavored. *See, e.g., Riverside School Dist. v. Career Technology Center of Lackawanna County*, 104 A.3d 73, 75–76 (Pa.Cmwlth.Ct.2014).

I am unpersuaded by this argument.

Section 10, an arguably superfluous provision, on its face, appears designed to protect the Bond Trustee's rights and limit the rights of the unsecured creditors, not the other way around. By itself, § 10 is insufficient to establish that the parties intended to reduce the Bond Trustee's allowed secured claim (or at least subordinate a portion of it). I consider it far more likely that § 10 was placed in the Settlement Agreement as a form of "belts and suspenders" provision to make it abundantly clear that the Bond Trustee's lien rights were unimpaired, except to the extent of the Bond Trustee Carve–Out, rather than as a manifestation of an implied intention to reduce the Bond Trustee's rights.

Furthermore, the provision may not even be surplusage in that it purports to provide the Bond Trustee with an express contractual right to recover any distributions on account of interest wrongfully made to unsecured creditors.

20. The Committee makes two (2) other related arguments that are unpersuasive.

The Committee suggests that the Bond Trustee is attempting to obtain a distribution from the Bond Trustee Carve–Out in contravention of § 7.3 of the Settlement Agreement ("Except as otherwise expressly set forth in this Agreement, neither the Trustee nor Beneficial Bank shall be entitled to any distribution from the Unsecured Creditors' Carve–Out"). Similarly, the Committee asserts that the Bond Trustee is attempting to expand the scope of its collateral because "it simply cannot be that a secured creditor can ... [recover] ... the full amount of its secured claim and still pay the carve out to the unsecured creditors from the same collateral pool." (Committee Brief at 6). However, these are both bootstrap arguments because they assume that the carve-out was intended to diminish or subordinate the Bond Trustee's allowed secured claim rather than simply provide the unsecured creditors with a minimum recovery through a priority interest in the proceeds of the collateral.

## V. CONCLUSION

For the reasons set forth above, I conclude that the pre-confirmation distribution on account of the Bond Trustee's claim may be completed in a manner that satisfies its claim in full and that it is unnecessary for the bankruptcy estate to retain the amount of the Bond Trustee Carve–Out as a Holdback to mitigate against the possibility that ultimately, there will be insufficient funds in the bankruptcy estate to pay unsecured creditors in full. An appropriate order follows.